**UNITED STATES of America, Appellee,**

**v.**

**Calvert H. FLETCHER, a/k/a "Hugh Fletcher," N. Karene Fletcher, a/k/a "Karene Grimsley," a/k/a "Karene Hagan," a/k/a "Karene (Grimsley) Hagan," a/k/a "Kay Hagan," a/k/a "N.K. (Grimsley) Fletcher," Defendants–Appellants.**

**No. 1706, Dockets 90–1081, 90–1082.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1990.

Decided March 4, 1991.

ed, that the trial judge erroneously excluded certain expert testimony and that the trial judge erroneously instructed the jury that it might infer their participation in a conspiracy from their conscious avoidance of knowledge of that conspiracy and from Mr. Fletcher's educational background. Because we find these arguments to be without merit, we affirm the judgments of the district court.

## BACKGROUND

In late 1979, Calvert H. Fletcher (Fletcher) was director of manufacturing for the Winchester Firearms Division of the Olin Corporation, later the United States Repeating Arms Company (Winchester). Unindicted co-conspirator Robert G. Morrison (Morrison), president and sole owner of Morrison's Security Wholesale, Inc. (MSW), approached Fletcher with a plan to manufacture and market a commemorative rifle. Although Fletcher was concerned that independently marketing the commemorative rifle might create a conflict of interest with his position at Winchester, he agreed to convince Winchester to manufacture the rifle. Fletcher demanded and received a 50% interest in the anticipated rifle profits. To conceal his conflict of interest from Winchester, Fletcher arranged to have his interest in the rifle business represented by an associate, unindicted co-conspirator Gene Quirini, and by his future wife, N. Karene Fletcher (Mrs. Fletcher).

In 1980, Morrison and Quirini, acting on Fletcher's behalf, created a partnership called Commemorative Products, Ltd. (CPL) to market the rifles. The defendants used CPL as part of a two-part plan to defraud the Internal Revenue Service (IRS). First, Morrison, Fletcher, Mrs. Fletcher and Quirini agreed to record any profits of CPL on the books of MSW where they could be offset by MSW's carry-forward losses. Second, they agreed to minimize CPL's taxable profits by distributing numbered lithographic prints of an oil painting together with rifles, and artificially inflating the cost of the prints. The co-conspirators also agreed to transfer certain of the profits from the sale of the

William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, Conn. (Ira B. Grudberg, of counsel) and Ronald A. Bredemann, Flood, Bredemann & Evans, Park Ridge, Ill. (James J. Ruane, of counsel), for defendants-appellants.

Linda K. Lager, Asst. U.S. Atty., D. Connecticut (Stanley A. Twardy, Jr., U.S. Atty., of counsel), for appellee.

Before PRATT, MAHONEY and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Calvert H. and N. Karene Fletcher appeal from judgments of the United States District Court for the District of Connecticut, T.F. Gilroy Daly, Judge, convicting them of conspiracy to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371. They assert that the statute of limitations expired before they were indict-

rifles to a preexisting Bahamian bank account controlled by Fletcher in the name of a shell corporation, Willowdale Industries, ostensibly to cover the costs of printing the lithographs. The parties further agreed that they would let the money remain off-shore in the Willowdale Industries account for some time before spending it, and that any spending would be off-shore. Morrison concealed the CPL partnership agreement from his accountant.

At Fletcher's direction, between May and November, 1981, Mrs. Fletcher and Morrison transferred $200,000 of the proceeds from the commemorative firearm undertaking to the Willowdale account in the Bahamas. In November, 1981, Morrison personally withdrew $50,000 from the account and then distributed the funds to himself and Fletcher. In February, 1982, Fletcher, Mrs. Fletcher and Morrison withdrew additional funds from the Willowdale account, and distributed the funds to themselves. At that time, Fletcher led Mrs. Fletcher and Morrison to believe there would be a later distribution of the balance of the hidden funds.

In 1982, however, the scheme soon began to unravel due to co-conspirator infighting. During 1980 and early 1981, MSW had collected advance money from gun customers on behalf of CPL and, at Fletcher's direction, Morrison had transferred $253,-000 of that money to a Chicago bank. Fletcher's agent Quirini, unbeknownst to Morrison, employed these funds to pay bills, taxes and loans for other non-CPL businesses in which he and the Fletchers were interested. Quirini, using a non-existent taxpayer ID number, also opened a bank account, to which only he and Fletcher had access, where he deposited some of the CPL money.

In 1983, after CPL fell behind in its payments to Winchester and Fletcher's manipulation of CPL funds came to light, Morrison threatened to expose Fletcher's participation to Winchester. In March, 1983, Fletcher bought Morrison's silence by arranging for Winchester to redeem stock owned by Morrison. Fletcher also promised Morrison that he would receive his full share of the commemorative rifle profits. On April 5, 1983, Fletcher made good on this promise by directing Mrs. Fletcher to execute a stock escrow agreement that would turn over certain stock to Morrison effective January 1, 1984. In addition, on April 5, 1983 Fletcher directed Quirini and Mrs. Fletcher to execute a $50,000 promissory note to Morrison. Despite these measures, after the stock redemption in March, 1983, Morrison approached an executive of Winchester and told him about Fletcher's involvement with CPL. On April 5, 1983—the date of Morrison's profit payoff—Morrison, Quirini and Mrs. Fletcher dissolved CPL. Morrison concealed from his accountant the termination of the CPL partnership agreement, as he had its formation, and did not file partnership returns for CPL in 1981 and 1982 as required by law.

At the trial, in which Morrison and Quirini testified for the government, Fletcher and Mrs. Fletcher were each convicted of a single count of conspiracy "to defraud the United States by impeding, impairing, obstructing and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue, to wit, income taxes," in violation of 18 U.S.C. § 371. This appeal followed.

## DISCUSSION

### I. Statute of Limitations

■ The Fletchers argue that the government had failed to plead and prove that the conspirators committed an overt act within the six-year statute of limitations applicable to tax fraud conspiracies. 26 U.S.C. § 6531(1); see United States v. Ingredient Technology Corp., 698 F.2d 88, 98–99 (2d Cir.), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). The limitations period begins to run after the last overt act in furtherance of the main goals of the conspiracy. Grunewald v. United States, 353 U.S. 391, 396–97, 77 S.Ct. 963, 969–70, 1 L.Ed.2d 931 (1957); United States v. Brasco, 516 F.2d 816, 818 (2d Cir.), cert. denied, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). Since the

indictment was filed on April 4, 1989, the central issue is whether any of the actions taken on April 5, 1983—specifically the partnership dissolution and the execution of the promissory note and escrow agreement in favor of Morrison—furthered the main goals of the conspiracy.

## A. Partnership Dissolution

■ In *Grunewald,* the Supreme Court explained that

> after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.... [A] vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after the central objectives have been attained, for the purpose only of covering up after the crime.

*Grunewald,* 353 U.S. at 401–02, 405, 77 S.Ct. at 972, 974. Thus, the life of a conspiracy cannot be extended for statute of limitations purposes by acts of concealment occurring after the conspiracy's criminal objectives have been fully accomplished even if those acts are "done in the context of a mutually understood need for secrecy." *Grunewald,* 353 U.S. at 402, 77 S.Ct. at 972; *see Ingram v. United States,* 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 1319 n. 10, 3 L.Ed.2d 1503 (1959); *Krulewitch v. U.S.,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949). Rather, in determining whether acts are within the statute of limitations period, we look to the scope of the original conspiratorial agreement. *See United States v. Sarantos,* 455 F.2d 877, 883 (2d Cir.1972).

■ The government contends that the dissolution of the CPL partnership was an act of concealment that furthered the main goals of the conspiracy. First, it urges that because the IRS had three years from the date of the filing of the Fletchers' 1982 tax return on June 17, 1983 to audit the Fletchers and assess them a deficiency, *see* 26 U.S.C. § 6501(a), the dissolution was a means of warding off or foiling an audit:

> The dissolution agreement is ... an overt act to the extent that any IRS agent looking at that dissolution agreement would still not be able to figure out who the real parties and interests are in this Commemorative Products undertakings, not the consequences of the dissolution.

Second, at oral argument, the government urged that dissolving the partnership relieved CPL of the need to file false or misleading tax returns.

Although the government maintains, based on Morrison's testimony, that the conspirators expressly contemplated concealment as part of their agreement and argues that the concealment is the essence of a tax fraud conspiracy, *see United States v. Potamitis,* 739 F.2d 784, 788 (2d Cir.) (quoting *Grunewald,* 353 U.S. at 405, 77 S.Ct. at 974), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984) (act of concealment was "essential" to success of robbery; jury could infer concealment was part of original conspiracy), we do not see how the dissolution of the partnership in this case would further that objective. *United States v. Steele,* 685 F.2d 793, 803 (3d Cir.), *cert denied sub nom. Mothon v. United States,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Since the Bahamian lithographic scam had already effectively rendered CPL profitless, the partnership dissolution, while it relieved the partnership from having to file future tax returns, would not lead to concealment of income, since there was no income that would be thereby concealed. Thus, since a reasonable jury could not have found that the partnership dissolution by itself concealed, or could have been expected to conceal, the tax fraud, the partnership dissolution cannot serve to commence the limitations period.

*United States v. Cunningham,* 723 F.2d 217 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), on which the government relies, presented a far stronger case that the overt acts

taken—lying to a tax advisor, refusing to obey a subpoena, destroying evidence and misleading numerous investigators—directly furthered the conspiracy's main concealment objective. In *Cunningham,* we did not mean to imply that every action undertaken during the life of a conspiracy, no matter how attenuated from the central aims of that conspiracy, necessarily becomes an act of concealment because of simple temporal fortuity. In this case, the partnership dissolution, like other legitimate business activities such as paying bills and opening bank accounts, served neither to hinder an investigation nor to hide material facts, and thus falls outside the scope of any express conspiracy to conceal. *See Grunewald,* 353 U.S. at 397, 77 S.Ct. at 970; *United States v. Rosenblatt,* 554 F.2d 36, 39 (2d Cir.1977).

### B. Execution of Promissory Note

■ However, we agree with the government that the execution of the promissory note on April 5, 1983, pled in the indictment and proved at trial, was an overt act in furtherance of one of the conspiracy's main objectives and thereby served to trigger the limitations period.

The Fletchers argue that the note did not further the conspiracy since Morrison testified that the note did not represent a profit payoff but was simply to cover his anticipated attorney's fees. The Fletchers also claim that because Morrison had already approached an executive of Winchester and exposed Fletcher's involvement with the commemorative rifle project by April 5, 1983 the conspiracy was necessarily terminated by that date. We reject both contentions.

While testifying that the note was to cover legal fees, Morrison also testified that the note was to "make up for some or the funds that had been missing from the Bahamian account." These missing funds represented the profits of the conspiracy that had been misappropriated by Quirini and the Fletchers. Thus, the government proved that Quirini and the Fletchers executed the note to secure for Morrison his fair share of the rifle profits. Since the conspiracy contemplated a division of profits among the co-conspirators, the execution of the note furthered one of its chief goals.

■ We also cannot agree that by April 5, 1983 Morrison had withdrawn from, and thereby effectively terminated, the conspiracy by reporting Fletcher's misdeeds to Winchester. A conspiratorial agreement that includes a payoff to each conspirator continues, for statute of limitations purposes, until the conspirators receive their anticipated economic profits. *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir.1982). "[W]here a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants." *Potamitis,* 739 F.2d at 788 (quoting *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978)); *United States v. Walker,* 653 F.2d 1343, 1347 (9th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). By his report to Winchester, Morrison at most abandoned a subsidiary objective of the conspiracy—the fraud on Winchester. He did not abandon either of the conspiracy's chief goals of profit distribution and fraud on the government.[1]

### C. Escrow Stock Agreement

The execution of the escrow stock agreement on April 5, 1983 was proven at trial but not pled in the indictment. Because we find that the execution of the promissory note on April 5, 1983, which was both pled and proven, was in furtherance of the main goals of the conspiracy, and thus satisfies the statute of limitations, we do not need to

---

1. Quirini testified that the inflated lithograph scam was designed to deceive inquisitive IRS agents and that Fletcher and Morrison shared this understanding. Morrison testified that the lithograph scheme was a "plan that we put together in order to defraud the Government, showing that we had spent for these prints more than what our actual cost was." The jury was entitled to credit these versions over *Fletcher's* statements that CPL was designed to deceive only his employer, Winchester, and not the IRS.

decide whether an overt act that is proven but not specified in the indictment, such as the execution of the escrow stock agreement, can satisfy the statute of limitations, an issue we left open in *United States v. Guerro*, 694 F.2d 898, 903 n. 6 (2d Cir. 1982), *cert. denied*, 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983).

## II. Jury Instructions

The Fletchers object to the portions of the district court's jury instructions bearing on the defendants' knowledge. In this case, the government was required to establish (1) the defendants' knowing and intentional participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme. *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir.), *cert. denied sub nom. Lyubarsky v. United States*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); *see also United States v. Gurary*, 860 F.2d 521, 527 (2d Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). On the first element, knowing and intentional participation, the trial court instructed the jury that it could consider:

> the nature and extent of a defendant's educational career background and expertise in this regard, but only as it relates to the question [of] specifically [sic] intent to commit the alleged offense.... In sum, the defendant ... must have intentionally engaged ... [in the conspiracy] for the purpose of furthering the illegal undertaking.

On the second element, knowledge of the unlawful aims of the conspiracy, the court gave a "conscious avoidance" charge, the essence of which was that:

> A defendant may be found by you, the jury, to have knowledge of the conspiracy's unlawful objective if he or she acted with deliberate disregard of a high probability that the conspiracy had such an objective, unless you find that he or she actually believed that such an objective did not exist.

We consider each of these instructions in turn.

### A. "Knowing Participation" and Education Background of Defendant

Fletcher, a non-practicing attorney with an accounting background, claims that the district court erred when it instructed the jury that it could consider "the nature and extent of a defendant's educational and career background and expertise ... but only as it relates to the question [of] specifically [sic] intent to commit the alleged offense." Fletcher maintains that this instruction, coming in the middle of the court's instruction on membership in the conspiracy, invited a jury to infer his knowing membership in the conspiracy from what he ought to have known about the tax law. Thus, Fletcher asserts that the trial court incorrectly diluted the conspiracy requirement of awareness, or actual knowledge, of the scheme to defraud. *See United States v. De Biasi*, 712 F.2d 785, 792–93 (2d Cir.), *cert. denied sub nom. Eboli v. United States*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983).

Significantly, the defendants' brief omits the word "intent" from his reading of the challenged portion, so that his version is that the jury was told it could consider "the nature and extent of a defendant's educational and career background and expertise ... but only as it relates to the question *specifically to commit* the alleged offense." While this version may add cohesion to the defendant's claim, it is incorrect. The court's use of the words "intent to commit" signalled to the jury that the defendant's background was relevant on the question of intent.

In a prosecution for tax evasion, what counts is the subjective belief of a defendant that his conduct will result in an unlawful evasion of taxes, not the degree to which tax laws are, or should be, objectively comprehensible to that defendant. *Cheek v. United States*, — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); *United States v. MacKenzie*, 777 F.2d 811, 818 (2d Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). We hold, as we have in the past, that the trier of fact may properly consider the general edu-

cational background and expertise of the defendant as bearing on the defendant's ability to form the requisite wilful intent. *See MacKenzie*, 777 F.2d at 818; *United States v. Jacobs*, 475 F.2d 270, 280 (2d Cir.), *cert. denied sub nom. Lavelle v. United States*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); *see also United States v. Rischard*, 471 F.2d 105, 108 (8th Cir. 1973).

■ It would have been preferable if this instruction, instead or coming in the midst of instructions on participation in the conspiracy, had been included with the instruction on specific intent. However, in view of the trial court's instruction to the jury that "you are to accept the law from the Court, this is from me, considering my charge as a whole" and our reminder in *United States v. Torres*, 901 F.2d 205, 240 (2d Cir.1990) (quoting *United States v. Birnbaum*, 373 F.2d 250, 257 (2d Cir.), *cert. denied* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967)) that " '[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial,' " we find that the challenged instruction did not constitute error requiring reversal. Viewing the charge in its entirety, *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), the jury was properly warned that reckless ignorance of the tax law does not constitute willful intent to violate the law, that willful participation in conspiracy requires "specific intent to do something the law forbids" and that the Fletchers were not guilty if they "actually believed that the agreement and understandings would not be used to defraud the Internal Revenue Service." In this light, it was not error for the court to instruct the jury that it could consider educational background and experience on the question of intent.

### B. Knowledge of Unlawful Aims and Conscious Avoidance Charge

The defendants argue that the district court erred in giving a conscious avoidance charge, both because the defendants did not "contest some specific aspect of knowl-edge necessary for conviction" and because there was no "adequate factual predicate for the charge." *United States v. Civelli*, 883 F.2d 191, 194, 195 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989) (citation omitted). They assert that because they conceded knowledge that the goal of the conspiracy was to minimize tax liability and denied only knowledge that certain means of achieving this goal were illegal, such a charge confused the jury. Thus, the defendants do not challenge the form of the charge; they claim that it was reversible error to give it at all. *See, e.g., United States v. Pacific Hide & Fur Depot, Inc.*, 768 F.2d 1096, 1099 (9th Cir.1985); *United States v. Beckett*, 724 F.2d 855, 856 (9th Cir.1984). We disagree.

■ The conscious avoidance charge is commonly used in this Circuit where a defendant claims lack of some specific aspect of knowledge necessary for conviction but where the evidence may be interpreted as deliberate ignorance. *Lanza*, 790 F.2d at 1022. Here, there is no basis for the defendants' assertion that there was no dispute over any specific aspect of their knowledge save that their conduct would violate the tax laws. The defendants' brief points out that they "denied the government's allegation that the goal of the undertaking was to defraud the IRS" and offered affirmative evidence that the "goals of the agreement" to use CPL as the vehicle for the commemorative rifle undertaking were "lawful." As in most tax fraud cases, the core dispute was whether the largely conceded business activities of the defendants were part of a knowing scheme to defraud the IRS. We have repeatedly held that a conscious avoidance charge is appropriate where the knowledge of the fraudulent goals of a conspiracy, as contrasted with knowing and intentional participation in the conspiracy, is at issue. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir.), *cert. denied sub nom. Lavery v. U.S.*, —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *Gurary*, 860 F.2d at 527; *United States v. Heinemann*, 801 F.2d 86, 94 (2d Cir.1986), *cert. denied*,

479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987); *Lanza,* 790 F.2d at 1022–23.

■ A factual predicate for the conscious avoidance charge existed in the ample evidence from which the jury could infer that defendants consciously avoided knowing the conspiracy's fraudulent purpose. While the defendants maintained that, at all times, they were unaware of this purpose, the jury heard evidence of Fletcher's silent interest in the commemorative firearm project and the CPL partnership, Mrs. Fletcher's use of aliases, the fraudulent activities of the CPL partnership, the commingling of CPL and MSW funds, the failure to file partnership returns, the failure to provide accountants with accurate information, use of false taxpayer identification numbers, surreptitious movements of funds in the Bahamas and the use of fraudulent invoices that inflated the costs of the lithographs furnished to commemorative firearm customers. Moreover, "[t]he present case ... [did] not involve merely a single transaction." *Gurary,* 860 F.2d at 527. The jury was plainly entitled to view the defendants' alleged ignorance of the conspiracy's objectives in the face of such evidence as conscious avoidance. Thus, it was appropriate for the district court to have given the charge.

*III. Exclusion of Evidence*

The defendants sought to introduce expert testimony from a certified public accountant, Gary Palmer, as to the lawful tax advantages that existed prior to 1976 for setting up foreign trusts on a theory that from 1980 to 1983, the time of the acts charged in the indictment, many people continued to believe that a lawful tax advantage existed for distributions by foreign trusts. They also offered the accountant's testimony as to the taxation of foreign corporations owned by United States citizens between 1980 and 1983. The defendants challenge the district court's refusal to admit this evidence and claim that as a result they were denied their right to present a full defense.

■ A trial court has broad discretion to determine relevancy and whether the probative value of evidence may be outweighed by other considerations such as its tendency to confuse the jury. *United States v. Bilzerian,* 926 F.2d 1285, 1294–95 (2d Cir.1991); *United States v. Vanwort,* 887 F.2d 375, 388 (2d Cir.1989), *cert. denied sub nom. Chapoteau v. United States,* —— U.S. ——, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990); *United States v. Cruz,* 797 F.2d 90, 95 (2d Cir.1986).

■ We see no basis to disturb the district court's ruling on the proffered testimony of the defense expert. The proffer was made after the testimony of Quirini, Morrison and Mrs. Fletcher but before that of Fletcher. At the time of the proffer, there was no testimony as to any foreign corporations and Quirini, Morrison and Mrs. Fletcher had testified that no money had been placed in trust accounts. Later, while Fletcher testified that the use of foreign corporations and trusts had been discussed by the conspirators and that, in substance, such use had lawful tax advantages, he testified that he did not have a trust account or own a corporation in the Bahamas. In view of this testimony, the district court did not abuse its discretion in excluding largely irrelevant evidence as to foreign trust tax effects in the United States that ceased to exist four years prior to the time of the acts alleged in the indictment and as to foreign corporation tax consequences which were not at issue in this case. The district court was not "manifestly erroneous" in excluding the proffered testimony as irrelevant under Fed.R. Evid. 401, *United States v. Diaz,* 878 F.2d 608, 616 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *United States v. Kraeger,* 711 F.2d 6, 7–8 (2d Cir.1983), especially because explaining the tax law is generally within the purview of the court, not expert witnesses. *See, e.g., Kraeger,* 711 F.2d at 7–8. Nor did the district court compromise the fifth amendment's guarantee of due process. *See Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Corr,* 543 F.2d 1042, 1051 (2d Cir.1976). The district court also did not err in excluding the expert evidence

**504**

pursuant to Fed.R.Evid. 702. The most such evidence could have done would have been to lend credence to Fletcher's claim, fully presented to the jury, that when foreign trusts and foreign corporations owned by United States citizens were discussed, he believed there were lawful tax advantages to such vehicles. But this marginal assistance to Fletcher would likely have contributed to jury confusion, not enlightenment, in view of Fletcher's testimony that he did not have a trust account or own a corporation in the Bahamas. Rule 702 predicates the admissibility of expert testimony on its assisting the jury. The district court did not abuse its discretion in excluding the Palmer testimony in this case.

For all of the foregoing reasons, the judgments of the district court are affirmed.