**UNITED STATES of America,
Plaintiff–Appellee,**

v.

Leroy **WARSHAWSKY** (93–1345); Ira Warshawsky (93–1346); and Ted Warshawsky (93–1473), Defendants–Appellants.

Nos. 93–1345, 93–1346 and 93–1473.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 18, 1994.

Decided March 29, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied June 23, 1994.

Kathleen Moro Nesi, Asst. U.S. Atty., Detroit, MI (argued and briefed), Michael Hluchaniuk, Asst. U.S. Atty., Bay City, MI, for U.S.

Barry S. Pechter (briefed), Michael D. Ettinger (argued), Ettinger & Pechter, Oak Lawn, IL, for Leroy Warshawsky.

Dennis A. Berkson and Henry B. Samuels, Chicago, IL (argued and briefed), for Ira Warshawsky.

Patrick A. Tuite, Arnstein & Lehr (argued), Patrick A. Tuite, Brent D. Stratton (briefed), Chicago, IL, for Ted Warshawsky.

Before: GUY and SILER *, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

The Warshawsky brothers, Leroy, Ira, and Ted, appeal their convictions and sentences for conspiring to transport stolen auto parts, in violation of 18 U.S.C. § 2314.[1] All three brothers contend on appeal that their conspiracy convictions cannot be sustained since most of the "stolen" property they purchased was not actually stolen. The Warshawskys also challenge the sufficiency of the evidence,

the jury instructions, and the sentencing calculation. We find no error in the trial itself, but nevertheless we conclude that an error in applying the sentencing guidelines requires that we VACATE and REMAND for resentencing.

## I. Background

Leroy, Ira, and Ted Warshawsky jointly operate M & A Automotive, an auto parts business in Chicago, Illinois. Their prosecution resulted from an undercover investigation into the distribution of stolen auto parts conducted by the Federal Bureau of Investigation from November, 1988, to January, 1991. In furtherance of this investigation, FBI Special Agent Ronald Watson posed as the owner of R.W. Expediters, an auto parts brokerage in Freeland, Michigan. During the course of the investigation, Agent Watson engaged in over one hundred stolen parts transactions, five of which involved the Warshawskys. Agent Watson taped nearly every phone conversation he had pursuant to the investigation, 50 of which involved one or more of the Warshawskys.

In November of 1988, Agent Watson began purchasing stolen auto parts from a thief named Steven LaFay. The parts Watson bought from LaFay were brand new General Motors ("GM") parts in original packaging, which had been stolen from a Lansing, Michigan, plant. LaFay testified at the Warshawskys' trial that all of the auto parts he sold were obtained by bribing guards at this Lansing plant "hundreds of times."

In addition to selling parts to Watson, LaFay also testified that he shipped stolen parts to the Warshawskys twice in 1990. LaFay explained that after negotiating the sales with Leroy, he would drive the parts from Lansing to Chicago, where Ted would unload the truck, and Ira would pay for the stolen parts. LaFay urged Ira to pay in cash, but Ira insisted on paying by check and getting a receipt. LaFay refused to put his name on the invoices he gave to Ira, and he persuaded Ira not to write the checks in

---

* Judge Siler did not participate in oral argument but participated in the decision after hearing oral argument tapes.

1. 18 U.S.C. § 2314 prohibits "transport[ing] ... in interstate or foreign commerce any goods ... of the value of $5,000 or more, knowing the same to have been stolen...."

LaFay's name. LaFay told Ira that he could cash the checks even if they were payable to fictitious persons. LaFay also told Ira that he did not want to pay any taxes on the proceeds from the sale.

Back in Michigan, LaFay unwittingly continued to deal with Agent Watson. On one visit to R.W. Expediters, LaFay noticed a number of air filters in the warehouse. Perhaps out of some sense of professional courtesy, LaFay suggested to Watson that he knew "a guy who'll buy" the filters. Acting on LaFay's advice, Watson made initial contact with Leroy Warshawsky by phone on August 15, 1990. After introducing himself as LaFay's friend, Watson offered to sell the filters to Leroy, but no immediate sale was consummated. Watson also spoke to Ted Warshawsky, and suggested that they might do business in the future, even if the Warshawskys were not interested in purchasing the air filters. Watson explained that he had "some contacts here in the plants" and that he could get parts "at a pretty good deal." Watson suggested that some of his parts "pretty much need[ed]" to be exported out of the United States to get those parts "the hell outta here." Watson testified at trial that auto parts brokers understand that parts "for export" are stolen parts. The transcripts of Watson's 50 recorded phone calls with the Warshawskys reveal over and over again that the Warshawskys understood the need to export Watson's parts.

On September 13, 1990, Watson phoned the Warshawskys again to see if they had decided to purchase the air filters. Watson reiterated that it was "probably best if" his parts were exported out of the United States. During the same conversation, Leroy asked Watson about the possibility of acquiring parts "for return," which is a specialized segment of the auto parts trade. The trade in "returns" defrauds a GM program which permits authorized dealers to return up to four percent of a year's purchases for a full refund. This generous return policy is designed to encourage dealers to stock an ample inventory of parts. It also deters financially-strapped dealers from dumping excess parts at unusually low prices. In the return market, brokers acquire new GM parts from people like LaFay or Watson and sell them to authorized dealers, who then return the parts to GM for a full refund. The trade in returns allows dealers to acquire new parts at a steep discount, and those parts are deceptively presented to GM as leftovers from the dealer's annual purchases. Sale of parts for return is not criminal *per se*, but the stolen parts market provides a prime source of discounted inventory enabling dealers to manipulate the return program. The transcripts of Watson's phone calls reveal that the Warshawskys repeatedly sought to acquire parts for return.

During their September 13, 1990, conversation, Watson warned Leroy about the need to avoid attracting attention to their activities:

WATSON: Well, the, the problem with a lot of this stuff, as you well know, if you have been dealing with our friend (LaFay), is that, eh, somebody needs to be real discreet with it, because, eh ...

LEROY: That's right, we know, I know that. .

WATSON: Because it, eh, could, it could end (laughs), end up getting somebody in a lot of trouble, but ...

LEROY: I know.

WATSON: ... but, eh, an, and that's one of the reasons I try and stay away a little bit from him (LaFay), too, 'cause some of the stuff he gets there is just no way a guy can dump that kind of stuff on the market without ringing bells.

LEROY: See, that's the problem....

The next day, Leroy called Watson to confirm their first transaction. Watson again warned Leroy that "we gotta be careful about where [the parts] go" because "they're hotter than hell." Leroy quickly reassured Watson that "the guys we go to, they don't, they don't talk."

Agent Watson shipped parts to the Warshawskys on five occasions. The first shipment, consisting of 6,240 oil filters, took place on September 26, 1990. When Watson called to confirm the shipment, he asked Ted if Leroy had explained the "need to be a little discreet" about the transaction. Ted reassured Watson that "everything" was discreet,

and agreed that the "less people know the better."

On October 3, 1990, Watson shipped 62,088 spark plugs to M & A Automotive. On October 25, 1990, Watson shipped 5,100 air filters to M & A. On November 27, 1990, Watson shipped 32,760 "hotter than hell" spark plugs and approximately 960 oil filters to M & A, with an express warning that they "gotta be handled discreetly." Finally, on December 27, 1990, Watson shipped 145 air conditioning compressors, 400 air filters, and 40 Corvette wheels to M & A. Watson described the parts in this fifth and final shipment as "hotter than a two dollar pistol" because they were "right out of the plant" and "right off a production line."

The Warshawsky brothers were jointly indicted on August 15, 1991. Count One of the indictment charged all three brothers with conspiring to transport stolen auto parts. Counts Two and Three of the indictment charged Leroy and Ira with transporting stolen parts on October 25, 1990, and December 27, 1990. At the conclusion of their trial, the jury found the Warshawskys guilty on all counts.

In response to the defendants' post-trial motion, the district court set aside the verdict against Leroy and Ira on Counts Two and Three of the indictment, which accused them of purchasing stolen property from Watson on two specific dates. *United States v. Warshawsky*, 818 F.Supp. 181 (E.D.Mich. 1993). The district court relied upon *United States v. Monasterski*, 567 F.2d 677 (6th Cir.1977), where this circuit ruled that one does not commit the federal crime of receiving stolen property unless the property at issue was in fact stolen. *Id.* at 679. The parts Agent Watson shipped to the Warshawskys were either donated by GM for use in the investigation, or recovered from other thieves and used in the sting with GM's permission. As a result, the parts Watson shipped to the Warshawskys on October 25 and December 27, 1990, were not actually "stolen," as charged in the indictment. The district court refused to set aside the conspiracy convictions, concluding that the rule of *Monasterski* did not preclude a conviction for conspiracy to receive stolen parts, even if the parts were not in fact stolen. As a result of the conspiracy conviction, Leroy and Ira were each sentenced to 36 months in prison, and Ted was sentenced to 33 months in prison.

## II.  A Conspiracy to Purchase Stolen Goods

The centerpiece of defendants' appeal is their vigorous contention that they cannot conspire to purchase stolen property if none of the property they purchased was actually stolen. In effect, they argue that the rule of *Monasterski*, which prevented their conviction for the *substantive* offense, should be extended to block their conviction for *conspiracy*. They base this entire line of argument on the premise that they did not purchase stolen auto parts during the pendency of the conspiracy. That is simply not true. The Warshawskys may not have purchased stolen auto parts from Agent Watson on the dates charged in the substantive counts of the indictment, but Steven LaFay testified that he sold stolen parts to them twice in 1990. LaFay's sales were not charged as substantive crimes because LaFay had not agreed to implicate the Warshawskys at the time of indictment. LaFay later pleaded guilty and testified as a witness for the prosecution.

Even if they never purchased stolen parts, we question whether *Monasterski* necessarily precludes a conviction for conspiring to purchase stolen parts. It is well-established that a conspirator need not successfully complete all of the elements of the underlying offense to be guilty of conspiracy. Rather, as Justice Jackson explained, "the agreement or confederation to commit a crime ... is what is punishable as a conspiracy, if any overt act is taken in pursuit of it, ... whether or not the contemplated crime is consummated." *United States v. Bayer*, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947). *See* TORCIA, WHARTON'S CRIMINAL LAW § 729 (14th ed. 1981 & Supp.1993) ("Criminal liability for a conspiracy is not affected by the fact that the purpose of the conspiracy was not accomplished, or that it was impossible for it to be accomplished.").

Two other circuits have upheld convictions for conspiring to receive stolen property even though the goods were part of a sting and therefore were not "stolen." For example, the court in *United States v. Petit*, 841 F.2d 1546 (11th Cir.), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988), concluded that a conspiracy to receive stolen property was possible even if the property was not "stolen," because the crime of conspiracy is completed once the conspirators agree to commit an offense, and some overt act furthers their agreement. *Id.* at 1550. *See also United States v. Rose*, 590 F.2d 232, 235 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979) ("although [18 U.S.C.] § 2314 cannot be violated unless there are in fact stolen goods, a conspiracy to violate that section occurs when two or more persons agree to attempt to commit acts which include all the elements of a crime under that section and any overt act is done"). *Cf. United States v. Giry*, 818 F.2d 120, 126–27 (1st Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987) (applying "the logic of *Rose*" to uphold a drug importation conspiracy conviction even though no drugs were ever imported into the United States).

The facts before us do not require resolution of this thorny issue, for there is ample evidence in the record that the Warshawskys did in fact purchase stolen auto parts during the pendency of the conspiracy. Even were we inclined to hold that a conspiracy conviction requires proof that the parts were stolen, the Warshawskys' convictions would still stand, since the proofs fully support a finding that they purchased stolen parts at least twice. That Agent Watson did not ship "stolen" parts on the dates charged in the indictment may, as the trial judge properly held, relieve them of criminal liability for the substantive offenses, but it has no impact on the validity of their conspiracy convictions.

### III. Sufficiency of the Evidence

▇ Ira and Ted claim that the government failed to prove, beyond a reasonable doubt, their knowledge that the parts were stolen.[2] To prevail on a challenge to the sufficiency of the evidence, it must be shown that no rational juror could have found them guilty, even when the evidence is viewed in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). There was more than ample evidence at trial from which a rational juror could have concluded that Ira and Ted knew that the parts they purchased from LaFay and Watson were stolen.

Ira kept the books at M & A. That role provided him with information concerning all of the stolen parts transactions. Ira paid for many of the stolen parts. He helped LaFay hide the transactions. He knew that LaFay refused to put his name on any papers connected to the parts. In addition, Ira asked Agent Watson about purchasing parts for return, which, as we noted, is an important objective of the stolen auto parts trade.

Ted unloaded the stolen parts delivered to M & A. That role directly exposed him to many of the stolen parts transactions. During one unloading, LaFay told Ted that the parts were being sold for far less than they were worth. Ted, like his brothers, asked Watson about the acquisition of parts for return. Ted also told Watson that he understood the "need to be discreet" about their dealings, and suggested that the "[l]ess people know the better."

In addition to the evidence detailed above, the government emphasized certain themes at trial which established that all three of the Warshawskys should have known that the parts were stolen. Specifically, the government argued to the jury that the nature of the parts sold by LaFay and Watson and the prices at which these parts were sold clearly indicated that the parts were stolen. In support, the government offered expert testimony that the parts were authentic GM parts, and that large quantities of such parts

2. Leroy does not join his brothers' challenge to the sufficiency of the evidence, which suggests that the evidence at trial clearly established that he knew the parts were stolen. In assessing Ira and Ted's knowledge that the parts were stolen, the jury could properly consider the fact that the defendants were both brothers and business partners, which raises a permissible inference that they might share information concerning their business activities.

are rarely sold to or by anyone outside of the GM network. The government also offered proof that the Warshawskys purchased these parts at an unreasonably steep discount.

Ira and Ted dispute the probity of this evidence. They argue that there are ways for brokers like themselves to acquire GM parts without resorting to theft. They presented expert testimony suggesting that several legitimate sources existed which could have provided them with authentic GM parts. For example, Fran Bodnar, sales manager for a parts manufacturer, testified that manufacturers often sell surplus parts at a substantial discount. However, GM's Director of Security, Dan Elliott, Jr., explained that GM never sells surplus parts, and actually prefers to scrap its surplus parts rather than dump them. Agent Watson testified that it is widely known in the industry that GM never sells surplus parts. James Halloran, an auto magazine editor, suggested that the parts might have come from a bankruptcy sale. But on cross-examination, Halloran admitted that he only knew of one authorized GM dealer who declared bankruptcy in the last five years. Upon further questioning, Halloran acknowledged that GM generally retains a security interest in a dealer's inventory—a strategy which specifically enables GM to recapture all of a dealer's parts in the event of a bankruptcy. Finally, Bodnar and Halloran suggested that brokers could obtain authentic GM parts as the result of a "stock lift," where a rival manufacturer buys or "lifts" all of a dealer's "stock" of a part in order to sell the dealer a new part. But on cross-examination, Halloran admitted that he had never heard of any stock lift involving GM parts.

■ Ultimately, the Warshawskys ask this court to embrace, on appellate review, a theory of their defense that the jury found unpersuasive. But it is the jury's function, not ours, to weigh the evidence and choose among competing views. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. A rational juror was entitled in this case to believe the prosecution's version of the events. Plainly the evidence was sufficient, viewed in the light most favorable to the prosecution, to establish Ira

and Ted's knowledge that they were purchasing stolen parts.

## IV. The Deliberate Ignorance Jury Instruction

■ The district court instructed the jury that a conviction for the substantive trafficking crimes charged in Counts Two and Three of the indictment was only proper if the government established beyond a reasonable doubt that each "defendant knew that [the auto parts] had been stolen." The jury was further instructed, in regard to Counts Two and Three, that knowledge that the parts were stolen could be proved under a theory of "deliberate ignorance" or "conscious avoidance," by showing that the defendants purposefully disregarded indications that the auto parts were stolen. The Warshawskys claim that it is impermissible to give a "deliberate ignorance" instruction in a conspiracy trial, since a conspiracy conviction requires proof that the defendants specifically intended to break the law together. Because a "deliberate ignorance" instruction is permissible to show a conspirator's knowledge of the unlawful aims of a conspiracy, we do not agree that the jury instructions were flawed.

The district court gave the following "deliberate ignorance" instruction, derived in large part from Sixth Circuit Pattern Jury Instruction 2.09:

Next I'll say something about proving a defendant's knowledge. Remember, please, that I have told you already that in order to prove the charge in Counts 2 and 3, the government has to satisfy you beyond a reasonable doubt that the defendant knew the property was stolen. Now how could a person's knowledge be proved? Probably the clearest way to prove it is with direct evidence that the person had actual knowledge. This might be done with proof of an outright admission or statement by the person that he knew that the property was stolen, or proof that the person was there and helping when it was stolen.

But another way that knowledge could be proven is indirectly, through circumstantial evidence which points toward a clear conclusion that the person knew the

property was stolen. Thus, a person who buys a stolen solid gold watch in a dark alley at 3:00 o'clock in the morning and pays only a few dollars while asking no questions could reasonably be said to have knowledge that the property was stolen.

Now this is so because no one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that a defendant deliberately ignored a high probability that the property in question was stolen, then you may find that he had such knowledge and that he, therefore, knew it was stolen.

The Warshawskys rely upon *United States v. Mankani,* 738 F.2d 538, 546–47 (2d Cir. 1984), where the court concluded that a defendant's agreement to conspire cannot be proved through deliberate ignorance. The *Mankani* court argued that a defendant who "consciously avoid[ed] participating in a conspiracy" could not at the same time be said to intentionally join a conspiracy. *Id.* at 547. *See also United States v. Ciambrone,* 787 F.2d 799, 810 (2d Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986) ("Conscious avoidance of participating in a conspiracy and agreeing to be a member of a conspiracy are mutually exclusive concepts.").

Under *Mankani,* the existence of an agreement or the entry into a conspiracy may not be proved by deliberate ignorance. However, *Mankani* does not apply when deliberate ignorance is used only to establish knowledge of the unlawful aims of a conspiracy. *See United States v. Brandon,* 17 F.3d 409, 453 n. 75 (1st Cir.1994) ("[A]t most, *Mankani* stands for the specific proposition that a 'conscious avoidance' instruction cannot be used to establish membership in a conspiracy and not the more general proposition that the instruction is never proper in a conspiracy case."). What the Warshawskys fail to understand is that the deliberate ignorance instruction was offered to prove their *knowledge of the aims of the conspiracy,* not to prove *the existence of an agreement.* "To

the extent that the instruction is merely a way of allowing the jury to arrive at the conclusion that the defendant knew the unlawful purpose of the conspiracy, it is hardly inconsistent with a finding that the defendant intended to further the unlawful purpose." *United States v. Investment Enterprises, Inc.,* 10 F.3d 263, 269 (5th Cir.1993). *See also United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986) ("The conscious avoidance charge commonly has been used where a defendant has claimed lack of some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance."). The deliberate ignorance instruction was properly used in this case to counter the Warshawskys' persistent claim that they were unaware that the parts were stolen.

A deliberate ignorance instruction in a conspiracy case has been approved by this circuit in *United States v. Lee,* 991 F.2d 343, 349–51 (6th Cir.1993). Lee was charged with a drug conspiracy. Like the Warshawskys, he denied knowledge of any illegal activity. Because circumstantial evidence strongly suggested that Lee knew what was occurring, the trial court issued the Sixth Circuit deliberate ignorance instruction. On appeal, we concluded that the "deliberate ignorance instruction was properly utilized," and we "expressly approve[d]" use of "Sixth Circuit Pattern Jury Instruction 2.09." *Id.* at 351. Other Courts of Appeals have reached similar conclusions. *See, e.g., Brandon, supra; United States v. Fletcher,* 928 F.2d 495, 502 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991) ("We have repeatedly held that a conscious avoidance charge is appropriate where the knowledge of the fraudulent goals of a conspiracy, as contrasted with knowing and intentional participation in the conspiracy, is at issue."); *Investment Enterprises, supra; United States v. Hoyos,* 3 F.3d 232, 236–37 (7th Cir.1993).[3]

---

3. Having vindicated the deliberate ignorance instruction in this case, we need not address the defendants' argument that the district court failed to issue proper limiting instructions. We also need not further address Leroy and Ira's

claim that the district court should have granted their partial acquittal before the case went to the jury, because the only prejudice that resulted from this delay, which we do not consider im-

## V.  Sentencing

United States Sentencing Guideline section 2X1.1 governs sentencing for conspiracies. To determine the base offense level for a conspiracy to receive stolen property, section 2X1.1(a) refers the sentencing court to section 2B1.2 of the guidelines which governs the substantive offense of receiving stolen property. The base offense level for receipt of stolen property, like all property offenses governed by the guidelines, is determined with respect to its value. *See* U.S.S.G. § 2B1.2(b)(1). The district court determined that the auto parts purchased by the Warshawskys were worth $519,391, which garners a total offense level of 16 under section 2B1.1(b)(1)(M). The court further enhanced the offense level by four levels under section 2B1.2(b)(4)(A) because the Warshawskys were "in the business of receiving and selling stolen property." Leroy and Ira were sentenced to 36 months each, and Ted was sentenced to 33 months. On appeal, the Warshawskys challenge both the valuation of the stolen property and the "in the business" enhancement.

■ We review *de novo* a sentencing court's application of the guidelines to an undisputed set of facts. *United States v. Wilson,* 920 F.2d 1290, 1294 (6th Cir.1990). Because we agree with the defendants that the sentencing court improperly calculated the value of the stolen property, we VACATE the sentences and REMAND for resentencing.

### A.  The Value of the Stolen Property

■ A sentence for federal property crimes is determined according to the value of the property involved because "[t]he value of property taken ... is an indicator of both the harm to the victim and the gain to the defendant." U.S.S.G. § 2B1.1, comment. (backg'd). Under "ordinary" circumstances, "fair market value" is the proper measure of the value of the stolen property. U.S.S.G. § 2B1.1, comment. (n. 2). The commentary to section 2B1.1 expresses a clear preference for the use of fair market value in sentencing for property crimes, but this general rule is

by no means absolute. "Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some [non-market] way, such as reasonable replacement cost to the victim." *Id.*

Although the Warshawskys participated exclusively in the wholesale auto parts market, the district court valued the stolen parts at $519,391 using GM's suggested retail price list. In using retail market value, the court offered the following justification:

> Fundamentally, Counsel, this—we have to focus on the fact, I think, that this is a conspiracy and the conspiracy—a conspiracy valuation is highly dependent, in my estimation, on the state of mind, the intent of the conspirator. I think that the phrase intended loss has a very great weight in these circumstances....

> [W]e have to figure out what the market is, certainly not the used part market I'm satisfied of that. I think the government's argument that the new part market is the place to focus for valuation of loss here or intended loss is appropriate, is substantiated by the record and by the law....

> The intended loss I think here is clearly far beyond half a million dollars.... And that is the Court's intended determination on that issue.

The defendants claim that the district court misapplied the market value rule by choosing the wrong market—the retail market—to value the stolen parts. Thus, the critical inquiry for the defendants is determining the proper market in which to value the parts. To the contrary, the government argues that the use of retail prices represents a non-market valuation justified by the exception to the market value rule for cases where "the market value is difficult to ascertain or inadequate to measure harm to the victim." The critical inquiry from the government's perspective is whether the circumstances in this case justify deviation from the market value rule. Our analysis leads us to conclude that the district court's sentencing calculation cannot be affirmed under either of these approaches.

proper in any event, was the issuance of the deliberate ignorance instruction.

■ If we assume that the district court's sentencing calculation represents an effort to determine the actual market value of the parts, we cannot agree that the proper market for valuation purposes was the retail market, because the retail market has literally no connection to this case. We understand that some cases require a sentencing judge to choose between a variety of markets affected by the defendant's criminal activity. In such cases, the sentencing court should apply "the standard test for determining market value of stolen property," by looking to "the price a willing buyer would pay a willing seller at the time and place the property was stolen" or "at any time during the receipt or concealment of stolen property." *United States v. Reid,* 586 F.2d 393, 394 (5th Cir.1978), *cert. denied,* 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979) (citations omitted); *United States v. Bakken,* 734 F.2d 1273, 1278 (7th Cir.1984); *United States v. Perry,* 638 F.2d 862, 865 (5th Cir.1981). All of the participants in this case—GM, M & A Automotive, R.W. Expediters, Steven La-Fay—interacted in the wholesale market. Indeed, none of the participants in this case ever handle parts *outside* of the wholesale market. We agree with the court in *Perry:*

> [T]he market value of goods stolen in wholesale lots from a wholesaler should be valued at the actual market value (i.e., the wholesale price) at which that victim offered the goods for sale rather than a fictitious retail price that might have been fixed by a retailer who had purchased the goods (at the wholesale price) for resale to an ultimate consumer at sufficient profit as suited the hypothetical retailer's purposes.

638 F.2d at 867–68. Certainly the wholesale market is the market in which the Warshawskys were competing, albeit unfairly and fraudulently.

■ Given the dubious connection between the Warshawskys' criminal activity and the retail market for auto parts, we are inclined to read the district court's sentencing calculation as a determination that the market value of the parts was "difficult to ascertain or inadequate to measure harm to the victim," rather than merely a selection of the wrong market for valuation. Within this framework, the question is whether the circumstances here justify the district court's deviation from the market value rule expressed in section 2B1.1. The plain language of Note 2 to section 2B1.1 applies the market value rule to all cases unless it is established at sentencing that "market value" is: (1) "difficult to ascertain," or (2) "inadequate to measure harm to the victim." This commentary establishes a two-step test for deviation from the market value rule. First, the sentencing court must attempt to determine the market value of the stolen property. If it is impossible or impractical to estimate the market value, then the sentencing court clearly has no choice but to deviate from the market value rule. *See United States v. Pemberton,* 904 F.2d 515, 515–17 (9th Cir. 1990) (upholding deviation from market value rule "in the absence of ... a market ... suppl[ying] a readily ascertainable price"); *United States v. Thomas,* 973 F.2d 1152, 1159 (5th Cir.1992) ("Only where ascertaining market value is impractical, may a court measure loss in some other way."); *United States v. Hernandez,* 952 F.2d 1110, 1118–19 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992) (upholding non-market valuation where estimate of market value would require expensive and complex calculations).

■ If some market value for the stolen property is readily-ascertainable, the sentencing court must proceed to the second part of the test by assessing the extent to which the market value adequately measures the harm to the victim or the gain to the defendant. If the sentencing court concludes that the market value inadequately measures the harm or the gain, then the court must select some appropriate alternative valuation technique. *See United States v. King,* 915 F.2d 269, 272 (6th Cir.1990) (upholding non-market valuation where victim's loss exceeded the market value of the stolen property); *United States v. Johnson,* 941 F.2d 1102, 1115 (10th Cir.1991) ("If the district court decides that the final figure is 'inadequate to measure [the] harm to the victim,' then the court is free to 'measure the loss in some other way, such as reasonable replacement cost to the victim.' "); *United States v. Ber-*

*kowitz,* 927 F.2d 1376, 1390 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). To facilitate appellate review, a sentencing court choosing to deviate from the market value rule should compile "an appropriate record with sufficient detail." *Johnson,* 941 F.2d at 1115.

Applying the test to the facts here, we look first to see if a market valuation of the stolen property can be readily ascertained. The presentence investigation report reveals three figures, precisely calculated and easily obtained, which could be used to gauge the market value of the stolen parts. The report establishes the price paid by the Warshawskys for the stolen parts, $46,075; the wholesale price of the parts, $173,376; and the retail price, $519,391. Nonetheless, the district court decided that market valuation was not possible because many of the stolen parts were destined to be scrapped by GM, which rendered their market value uncertain. Yet this analysis betrays the fundamental rationale for sentencing according to property values—the desire to estimate the "harm to the victim and the gain to the defendant." A central theme of the prosecution was the demand for stolen parts which could be fraudulently returned to GM for *wholesale* price refunds. Judging from the evidence at trial, it is fair to conclude that the Warshawskys' entire fencing operation depended upon its potential to defraud GM's wholesale return policy. When stolen parts are traded expressly to obtain fraudulent wholesale refunds from the manufacturer, the "gain" to the thief is clearly the wholesale price, and the harm to the victim can at least be approximated by that same figure. We cannot avoid the conclusion that the market value of the parts was their wholesale price of $173,376, a reliable value readily available to the district court for use at sentencing.[4]

Given the properly determined market value of the stolen property, the second part of the 2B1.1 test is to assess the adequacy of market valuation as a measure of the victim's loss and the defendant's gain. Although the Sentencing Commission has clearly instruct-ed courts to use market value in calculating sentences, it has also recognized that in some cases market value will "inadequately" gauge the severity of a defendant's conduct. In this case, we have no clearly-articulated indications from the sentencing court that the wholesale market value of the parts was an inadequate measure of the harm to GM or the gain to the Warshawskys. We have even less explanation why retail prices somehow more accurately gauge the severity of the Warshawskys' wrongdoing. We see no way to agree with the sentencing court's deviation from the market value in this case—a case with a readily available market for valuing the parts—in the absence of some sufficiently detailed justification for doing so.

### B. The Business of Receiving and Selling Stolen Property

The final sentencing challenge is whether the Warshawskys were "in the business of receiving and selling stolen property," which earned them a four level enhancement under section 2B1.2(b)(4)(A). The interpretation of section 2B1.2(b)(4)(A) is a question of first impression in this circuit, and it is a question that has rarely been addressed by the United States Courts of Appeals.

We look first to the text of the guideline itself, which authorizes a sentence enhancement "[i]f the offense was committed by a person in the business of receiving and selling stolen property." U.S.S.G. § 2B1.2(b)(4)(A). A person "in the business of receiving and selling stolen property" is a person once referred to less flatteringly as a "fence." *United States v. Esquivel,* 919 F.2d 957, 959 (5th Cir.1990) (section 2B1.2(b)(4)(A) "refers to a person engaged in what are generally known as fencing operations"); *United States v. Braslawsky,* 913 F.2d 466, 468 (7th Cir.1990) ("The common understanding of a person in the business of receiving and selling stolen property is a professional fence...."). The Sentencing Commission has decided that fences deserve longer sentences than mere thieves because a

---

4. We summarily reject the defendants' claim that the parts destined for scrap had a dollar value of zero. It cannot seriously be contended that GM suffered no harm when it paid out full wholesale refunds to dealers who had purchased these parts for pennies on the dollar.

sentence based solely on "the amount of (stolen) property" recovered by the police "is likely to underrepresent the scope of their criminality and the extent to which [the defendant] encourage[s] or facilitate[s] other crimes." U.S.S.G. § 2B1.2, comment. (backg'd).

The court in *Braslawsky* interpreted the fencing enhancement as a question of first impression in its own circuit. The defendant in *Braslawsky* had stolen a substantial amount of property and sold it on the black market. Interpreting the fencing enhancement according to the policy expressed in the guideline commentary, the court reversed the enhancement because the defendant had not "encourage[d] the commission of other thefts" as fences are generally presumed to do. *Id.* at 468. While the defendant in *Braslawsky* was guilty of theft and of selling stolen property, there was no evidence whatsoever that he had created a market for property stolen by others. The court concluded that the defendant was not a fence because he only sold property he had stolen himself. *Id.*

It is hard to conceive of a case farther from the facts of *Braslawsky* than the one at bar. In *Braslawsky*, the defendant never purchased stolen property, and therefore he never encouraged others to steal. In this case, the Warshawskys purchased tens of thousands of dollars of stolen property and bestowed bountiful rewards on individuals willing to steal the property of others. In the words of the *Esquivel* court, "[r]eceiving and reselling stolen property accurately describes" what the Warshawskys were " 'in the business of' doing." 919 F.2d at 960.

The Warshawskys dispute the fencing enhancement because, they claim, there was no proof that they fenced stolen property with regularity. They characterize the evidence at trial as seven isolated stolen property transactions.[5] In the absence of any reference in the guidelines to regularity of fencing activity, they rely exclusively on *United States v. St. Cyr*, 977 F.2d 698 (1st Cir.1992).

In *St. Cyr*, the First Circuit concluded that the fencing enhancement was not appropriate for a defendant who had only engaged in two successful fencing transactions. *Id.* at 700. In reversing the enhancement, the *St. Cyr* court embraced an unwieldy case-by-case multi-factored balancing test:

> [I]n mulling whether to impose the [fencing] enhancement, the sentencing judge must undertake a case-by-case approach, weighing the totality of the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation, in order to determine whether a defendant is "in the business" of receiving and selling stolen property.

*Id.* at 703.

We are confident that the seven fencing transactions evidenced at trial would satisfy the *St. Cyr* test, if that were the test in this circuit. We prefer instead the test of *Esquivel, supra,* and *Braslawsky, supra,* where the sentencing courts merely examined the defendant's operation to determine: (1) if stolen property was bought and sold, and (2) if the stolen property transactions encouraged others to commit property crimes. In this case, the Warshawskys' operation provided a powerful conduit for the distribution of stolen auto parts. Given the scope of the operation, the fencing enhancement was proper.

For the foregoing reasons, the convictions of the defendants are AFFIRMED, but their sentences are REVERSED and REMANDED for resentencing in accordance with this opinion.

---

5. Actually, the Warshawskys characterize the evidence at trial as two stolen property transactions involving Steven LaFay, and five "non-stolen" property transactions with Agent Watson. However, the sentencing court is entitled to consider all relevant conduct in calculating a defendant's sentence, U.S.S.G. § 1B1.3, and all seven transactions, which were believed at the time to involve stolen property, are certainly relevant for sentencing in this case.