97 F.3d 1453
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Odis Kermit HUGHES, Defendant-Appellant.
 No. 95-5420.
 United States Court of Appeals, Sixth Circuit.
 Sept. 10, 1996.
 
 Before: MILBURN and BOGGS, Circuit Judges; and QUIST, District Judge*.
 PER CURIAM.
 
 
 1
 Defendant Odis Kermit Hughes, the "fence" in a scheme to steal tires from interstate shipments, appeals on numerous grounds his conviction and sentence for violating 18 U.S.C. §§ 659 and 2312-2314. We affirm in all respects.
 
 
 2
 * Hughes was one of seven conspirators indicted on September 8, 1993. He was included in only one count of that indictment, for conspiring to steal tires from interstate shipments and conspiring to receive, possess, and transport property stolen from interstate shipments. His trial began on January 4, 1994. Co-defendant Randy Ingram's trial was severed from that of the remaining defendants, and co-defendant George Labbous's motion for a mistrial was granted. Labbous and Ingram were then jointly tried beginning April 5, 1994. United States v. Labbous, 82 F.3d 419, 1996 WL 166691, at ** 1 (6th Cir.1996) (unpublished per curiam) [hereinafter Labbous & Ingram]. On January 14, 1994, Hughes was convicted by the jury of the one count with which he was charged. A separate jury found Labbous and Ingram guilty on May 2, 1994. Ibid. On January 3, 1995, the district court denied Hughes's motion for a new trial, which was partly based on evidence that the government had made available to defense counsel for Labbous and Ingram during their joint trial. On July 28-29, 1994, the district court held a joint sentencing hearing for all convicted defendants on the issue of the value of the stolen tires for the purposes of calculating the applicable offense level under the Sentencing Guidelines. The court was presented with two sets of possible values of the stolen tires: the retail value of the tires and the amount insurance companies paid to the victimized companies. The court decided to use the retail value in calculating the amount of loss caused by the thefts, finding that the defendants would have profited from their thefts if the lower insurance values were used. On February 17, 1995, the court sentenced defendant Hughes to 37 months in prison. Hughes filed a timely notice of appeal.
 
 
 3
 This case began when the FBI started investigating the theft of a trailer containing an interstate shipment of 250 Bridgestone truck tires valued at $134,290. The trailer was stolen on June 6, 1991, from a terminal in Nashville, Tennessee. In July 1991, the FBI received information that identified Joe and Randy Ingram as suspects in this theft. On February 11, 1993, FBI agents interviewed Joe Ingram, who promised to provide investigators with all the information concerning his involvement in the conspiracy's thefts from interstate tire shipments, as well as the identities of his co-conspirators. Joe Ingram claimed that he became involved in the conspiracy because his brother urged him to do so and because of his own financial difficulties. Joe Ingram also claimed that he was involved in only three tire thefts that occurred in 1991, and that his participation in the conspiracy ended before 1992 because he and his brother had a disagreement over money. According to Joe Ingram, Randy Ingram had participated in at least three other tire-stealing incidents, and Joe Ingram relayed this information to the FBI.
 
 
 4
 On September 16, 1992, the FBI was able to trace some of the stolen Bridgestone tires to Gregg Swindle, the parts manager at Bob Williams Dodge Dealership in Rome, Georgia. When interviewed, Swindle told the FBI that he obtained the tires from Labbous and Labbous's nephew. He also said that an individual known to him as "Otis" operated a warehouse in Lafayette, Georgia that was somehow connected to his purchase of Bridgestone tires from Labbous.
 
 
 5
 The FBI identified "Otis" as Odis Kermit Hughes. Hughes denied any knowledge of stolen tires, but admitted he had known Labbous for approximately 20 years. He gave the FBI permission to search his business, but this search turned up no stolen tires. A review of Hughes's telephone records revealed calls between Labbous and Hughes on or around the dates of some of the tire thefts.
 
 
 6
 James Perry informed FBI investigators that Hughes had contacted him telling him he knew someone who was selling tires for a "quarter." Perry stated that he had known Hughes for 30 years and Labbous for about 15. Perry himself denied buying any of the tires.
 
 
 7
 In connection with another theft of tires, the Tennessee Highway Patrol stopped Anthony Marjet Simpson, another member of the conspiracy, driving a stolen white Ryder truck fitting the description of a truck reportedly used in a number of the thefts. On that same day, September 3, 1992, the FBI interviewed Simpson, who furnished them with a taped confession of his participation in one of the tire thefts. He also implicated Randy Ingram in the conspiracy. On February 10, 1993, Simpson implicated Labbous and Hughes, telling FBI agents that he, Simpson, had transported stolen shipments of tires to Hughes's warehouse.
 
 
 8
 At Hughes's trial, the government presented proof showing that Hughes played the role of warehouseman and "fence" for the stolen tires. He never actually stole tires himself, but he did provide a tractor and help to transport a single load of stolen tires. The jury found the foregoing evidence sufficient to convict Hughes.
 
 
 9
 Joe Ingram testified at Hughes's trial that he participated in only 3 of 14 thefts of tires, all before 1992. He stated both before the grand jury and at his plea colloquy that these were the only thefts in which he participated. He never mentioned Hughes during his testimony nor implicated or incriminated Hughes in any way. During the Randy Ingram and Labbous trial in April 1994, Joe Ingram testified on cross-examination that he had discussed with FBI agents the possibility of his having access to or providing Bridgestone tires to other members of the conspiracy and discussed his going to Nashville in order to steal a load of tires between May and August 1992. Joe Ingram testified:
 
 
 10
 [DEFENSE COUNSEL:]: Have you had anything to do with stolen tires since October of '91?
 
 
 11
 [JOE INGRAM:] No, ma'am, not that I know of.
 
 
 12
 [DEFENSE COUNSEL:] Well, you'd know certainly, sir, if you had something to do with stolen tires, wouldn't you?
 
 
 13
 [JOE INGRAM:] I might have talked to somebody about tires or something, but I haven't stolen any.
 
 
 14
 When the issue of Joe Ingram's discussions with the FBI about his participation in thefts after 1991 was raised in various motions, the government immediately acknowledged that it had possessed certain information prior to trial, but did not think it impeachment material, and so did not turn it over to the defendants' attorneys. The government provided an FBI letter relating to this matter to the court and to defendant Labbous at that time. Randy Ingram already had a copy. The government also provided to Labbous and Randy Ingram additional information regarding the possibility that Joe Ingram had gone to Nashville in 1992 to steal tires. Hughes was later given this same material.
 
 
 15
 Also, during his September 8, 1993, grand jury testimony, FBI Special Agent J. Steven Dickey stated that Joe Ingram admitted to being involved in thefts of tires on March 30, 1991, September 6-7, 1991, and December 20, 1991--thefts in which Randy Ingram and Simpson had also participated. These statements were incorrect in that Joe Ingram did not admit to the FBI that he was involved in the March, September, or December 1991 thefts, although Joe Ingram had told the FBI that his brother, Randy, and Simpson participated in those thefts. Dickey therefore testified to the grand jury that Joe Ingram had admitted to participating in six thefts instead of the correct number of three. Joe Ingram, however, testified before the grand jury that he participated in only three thefts. Dickey corrected his own errors when he testified at Hughes's trial.
 
 II
 
 16
 Hughes's appeal is based largely on events at the trial of co-defendants Labbous and Randy Ingram. Similar assignments of error made by Randy Ingram and Labbous have already been addressed and rejected in a recent unpublished case, Labbous & Ingram.
 
 
 17
 The government rather cleverly attempts to frame most of Hughes's issues on appeal as arguments that the district court erred in refusing to grant him a new trial under Fed.R.Crim.P. 33, thus triggering review for abuse of discretion. However, while Hughes does raise some of the same issues he raised in his motion for a new trial--a motion he claims on appeal was erroneously denied--he also raises them directly, which he would have been entitled to do had he never filed a motion for a new trial. Therefore, we must apply the standard of review applicable to each of the relevant issues as if the district court had not previously addressed them in a Rule 33 motion. As all of Hughes's pure claims for a reversal of his conviction, however, are lacking in merit, we also hold it was not an abuse of discretion for the district court to have denied him a new trial on the same grounds.
 
 
 18
 A. ALLEGATION OF PERJURY ON SPECIAL AGENT DICKEY'S PART
 
 
 19
 Hughes challenges the issuance of an indictment against him based on allegedly perjured testimony before the grand jury. When reviewing an allegation that an indictment should have been dismissed, we inquire into whether the defendant can show that any errors in the grand jury process were prejudicial. Bank of Nova Scotia v. United States, 487 U.S. 520, 524 (1988). Here, Hughes can show that Special Agent Dickey's testimony exaggerating the number of thefts Joe Ingram admitted he participated in was false. This is obviously the first step in showing that there was a prejudicial error in the grand jury process. However, Hughes cannot show that Special Agent Dickey's testimony was prejudicial. First, Joe Ingram did not implicate Hughes in the conspiracy and so any evidence relating to Joe Ingram that was presented to the grand jury, such as that offered by Special Agent Dickey, would not have influenced the verdict in Hughes's case. Second, Special Agent Dickey corrected his own errors at Hughes's trial. Third, Joe Ingram correctly testified before the grand jury that he participated in only three thefts instead of the six Special Agent Dickey referred to. Finally, we note that Hughes's argument that he was prejudiced by Special Agent Dickey's error is ironic. Hughes claims in his second assignment of error that Joe Ingram actually participated in more thefts than three. Boiled down to its essence, Special Agent Dickey testified to this same conclusion in front of the grand jury. Thus, Hughes's second assignment of error contradicts his first and shows how Special Agent Dickey's testimony, while false, was not prejudicial. Hughes cannot claim that he was simultaneously prejudiced by testimony that Joe Ingram admitted to participating in too many thefts and that he admitted to participating in too few. Moreover, any conflict between the testimony of two government witnesses, such as the conflict between Special Agent Dickey's testimony and Joe Ingram's testimony, could only have had the effect in the grand jury's minds of diminishing, rather than increasing, the likelihood that an indictment would be returned. Hughes's first assignment of error must be rejected because, while he can show certain testimony before the grand jury was false, he cannot show it was prejudicial.
 
 
 20
 There are two other barriers to Hughes's first assignment of error. The standard of review on this issue in the Sixth Circuit is one of "actual prejudice," meaning that the defendant must prove that there is no competent evidence on which to sustain the indictment issued by the grand jury other than the evidence alleged to be false or misleading. United States v. Adamo, 742 F.2d 927, 939 (6th Cir.1984), cert. denied sub nom. Freeman v. United States, 469 U.S. 1193 (1985). There was more than enough competent evidence offered to the grand jury to support Hughes's indictment other than that offered by Special Agent Dickey in reference to Joe Ingram, because Joe Ingram's testimony was simply irrelevant to Hughes's guilt, as Joe Ingram never implicated Hughes.
 
 
 21
 Additionally, to secure a declaration that the indictment against him was constitutionally defective, Hughes must show in addition to prejudice that there has been longstanding prosecutorial misconduct in the district in question. United States v. Azad, 809 F.2d 291, 294 (6th Cir.1986), cert. denied sub nom. Bigley v. United States, 481 U.S. 1004 (1987). He has not even attempted to meet this requirement.
 
 
 22
 With respect to the same issue, the court in Labbous & Ingram held:
 
 
 23
 In the instant case, the false testimony proffered by Agent Dickey--that co-conspirator Joe Ingram admitted to being involved in six rather than three criminal acts--related to Joe Ingram's continuing participation in the conspiracy. It had no direct relevance to [Labbous's and Randy Ingram's] participation in the crimes. The Defendants claim that the testimony made it appear as if the government had a stronger case, in general, than it actually had. That argument is unpersuasive. This false testimony did not prejudice Defendants. Moreover, Joe Ingram testified in front of the same grand jury and explained his limited participation. To the extent Dickey's false testimony to the grand jury created any misconceptions, they were diminished by the testimony of Joe Ingram. Finally, there was no proof of a longstanding problem of prosecutorial misconduct in grand jury proceedings in this district.
 
 
 24
 Labbous & Ingram, 1996 WL 166691, at ** 2.
 
 
 25
 B. ALLEGATION OF PERJURY ON JOE INGRAM'S PART
 
 
 26
 "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989). In order to meet this test of prosecutorial misconduct, Hughes must show that (1) the statement was false; (2) the statement was material; and (3) the prosecution knew it was false. United States v. O'Dell, 805 F.2d 637, 641 (6th Cir.1986), cert. denied, 484 U.S. 859 (1987). The burden is on Hughes to show that Special Agent Dickey's testimony was perjured. United States v. Griley, 814 F.2d 967, 971 (6th Cir.1987). Here, Hughes can meet none of the three O'Dell requirements, because he cannot even establish that Joe Ingram's testimony that he stopped participating in tire thefts sometime in 1991 was untrue. The FBI material and Joe Ingram's testimony reveal only that Joe Ingram spoke to people about engaging in tire thefts in 1992. Talking to people about engaging in tire thefts and actually engaging in tire thefts are two different matters. Talking to someone about participating in tire thefts, of course, raises the inference that one might have participated in the tire thefts discussed. The mere fact that such an inference could be drawn is insufficient to allow Hughes to carry his burden of proof that Joe Ingram's testimony that he withdrew from the conspiracy in 1991 was false. Moreover, Hughes cannot show that Joe Ingram's testimony was material with respect to his conviction because Joe Ingram never implicated Hughes at all in the tire thefts.
 
 
 27
 In Labbous & Ingram, the court held, with regard to the same issue raised here by Hughes: "We do not need to address all of the elements of [the O'Dell ] test. The alleged false testimony was not material. Further, given the magnitude of the evidence presented in this case, and the fact that Joe Ingram was tested on cross-examination, allowing the jury to see him, 'warts and all,' any misconduct in this instance was harmless error." Labbous & Ingram, 1996 WL 166691, at ** 3. This same rationale applies with even more force in this case because Hughes's defense counsel was not one of those who chose to cross-examine Joe Ingram at trial.
 
 C. GIGLIO MATERIAL[1]
 
 28
 In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that failure by the prosecution to turn over exculpatory evidence violates due process. In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court made clear that evidence usable for impeachment purposes should be considered exculpatory evidence for the purposes of the Brady doctrine. The court's inquiry in determining whether the government's failure to turn over admittedly Giglio material in this case, namely an FBI letter and information from an FBI informant indicating that Joe Ingram spoke about participating in tire thefts after 1991, is again whether it was reasonably probable that the information would have been material to the outcome of the verdict. United States v. Bagley, 473 U.S. 667, 682 (1985).
 
 
 29
 The government, not surprisingly, focuses on the fact that the district court rejected Hughes's motion for a new trial, arguing that the standard of review that should be applied here is a four-part test in O'Dell for when newly discovered evidence should result in a new trial. The government urges the use of this test because the fourth part of this test requires the defendant to show that the new evidence is likely to produce an acquittal. This standard is obviously higher than that imposed in Bagley, which requires only a showing that there exists a reasonable probability that the evidence would have affected the jury's verdict. The reason for the difference is that more is at stake in a case like this than when the newly discovered evidence was unknown to the government and to the defense. The latter situation is the one for which the higher standard in O'Dell is designed. The district court correctly held that the FBI material relating to Joe Ingram's participation in tire thefts after 1991 could have been used to impeach him, and that the government should have recognized this. Thus, in addition to the ever-present interest of the judiciary in ensuring that the results in criminal cases are correct, the fairness of the process of arriving at even correct results is also at stake when the government fails to turn over evidence in its possession, to which the defense is entitled under Brady, in response to a discovery request.
 
 
 30
 Even with the less-demanding reasonable probability standard in place, however, Hughes's challenge to his conviction must be rejected. Joe Ingram was impeached quite thoroughly by other defense counsel and it is impossible for Hughes to show that if he had only had one more piece of impeachment evidence, there was a reasonable probability he would have been acquitted. And once again, it is highly significant that Joe Ingram did not implicate Hughes in the conspiracy. By contrast, in Giglio the withheld impeachment testimony related to the key witness, and there appeared to be no other effective impeachment of that witness conducted at trial. See Giglio, 405 U.S. at 150-52.
 
 D. SENTENCING
 
 31
 Findings of fact relating to sentencing are reviewed for clear error. 18 U.S.C. § 3742(e); United States v. Hamilton, 929 F.2d 1126, 1130 (6th Cir.1991). Hughes argues that the amounts the owners of the stolen tires recovered from their insurers should have governed his amount of loss calculation under USSG § 2B1.1. United States v. Warshawsky, 20 F.3d 204, 213 (6th Cir.1994), sets out the two-step process for determining which among alternative figures should be used in calculating the amount of loss caused by a defendant in this sort of case: (1) determine a market value for the stolen property, if such a value is readily ascertainable, otherwise deviate from the market value rule; (2) if a market value is ascertainable, determine whether the value chosen to represent the loss adequately measures the harm to the victim or the gain to the defendant, then fix loss as the greater of these two figures. In this case, the district court had before it two readily available market values: (1) the insurance recoveries for the stolen tires, which Hughes seems to argue were based on wholesale prices and (2) the retail prices of the tires. Thus, the case hinges on the application of Warshawsky's second step, which provides a means for selecting in particular cases which of two readily available market values is more appropriate to apply. In applying this two-step test, the Warshawsky court selected wholesale price as the appropriate measure of the value of the stolen property in that case, but did not create an inflexible rule requiring the selection of wholesale price in all cases. Here, it was not clear error for the district court to conclude that the gain to Hughes in this case was greater than that measured by the insurance recovery figures, which we will assume adequately measures the loss to the victims of the conspiracy. Many of the stolen tires were sold on the retail market. In Warshawsky, by contrast, the defendants were engaging in a fraudulent wholesale refund scheme, and so, not surprisingly, the court concluded that the gain to the defendants was adequately measured by wholesale price. Therefore, under Warshawsky, Hughes's sentencing argument fails.
 
 
 32
 The Labbous & Ingram court reached a similar conclusion: "Although the tires were stolen from the wholesale stream of commerce, many were eventually offered for sale either in small quantities or to the general public as consumers. This amount, therefore, adequately represents what the Defendants would have attained through the criminal conspiracy." Labbous & Ingram, 1996 Wl 166691, at ** 4.
 
 III
 
 33
 Finding no merit in any aspect of Hughes's appeal, we AFFIRM his conviction and sentencing in all respects.
 
 
 
 *
 The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The Labbous & Ingram case rejected the defendants' Giglio challenge because those defendants had the opportunity to use the previously undisclosed information at trial. Obviously, because the Giglio evidence was discovered after Hughes had already been convicted, however, the court cannot rest on this rationale in Hughes's case