**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Tareq SHALASH, Defendant–Appellant,**

**Ziyad Shalash, Defendant–Appellant.**

Nos. 03–5037, 03–5038, 03–5210, 03–5211.

United States Court of Appeals,
Sixth Circuit.

Aug. 11, 2004.

Rehearing En Banc Denied Oct. 18, 2004.

Kenneth R. Taylor, Asst. U.S. Attorney, U.S. Attorney's Office, Lexington, KY, for Plaintiff–Appellee.

E. Lambert Farmer, Jr., Robert C. Webb, Frost, Brown & Todd, Louisville, KY, for Defendant–Appellant.

Before SUHRHEINRICH, GIBBONS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

A jury convicted Tareq Shalash and his brother, Ziyad, of numerous criminal counts stemming from their operation of a family business that served as a fence for stolen goods. On appeal, the Shalashes argue that: (1) the district court erroneously admitted evidence related to their race and ethnicity; (2) the Government engaged in prosecutorial misconduct during the closing argument; (3) the district court erred in instructing the jury on deliberate ignorance; and (4) the Government offered insufficient evidence to convict. As none of these challenges rises to the level of reversible error, we affirm.

## I.

The Shalash brothers, along with their father "Big Man," operate Unity Wholesale Grocers and United Trading Company, which are located in Lexington, Kentucky. The two companies buy consumer goods from a variety of sources, repackage them and sell them to retailers—what is otherwise known as the "diverting" business.

At some point the Shalashes began buying and selling stolen goods through these companies. Law enforcement officials in Kentucky, Ohio and Tennessee determined that the Shalashes acquired the stolen goods in a number of ways: they bought them from local shoplifters; they bought them from a woman (Misty Washabaugh) who ran an interstate shoplifting ring; they purchased stolen trailers that were full of consumer goods; and they bought one item—stolen infant formula—from small, independent operations in Cincinnati and Columbus, Ohio.

On November 1, 2001, a federal grand jury returned a 27–count superseding indictment against the Shalashes. The indictment charged the brothers with two violations of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 *et seq.* And it charged them individually with a multitude of other offenses: (1) transporting stolen goods in interstate commerce, 18 U.S.C. § 2314; (2) receiving stolen goods that moved in interstate commerce, *id.* § 2315; (3) receiving

goods stolen from a shipment in interstate commerce, *id.* § 659; (4) conspiring to commit several of these offenses, *id.* § 371; and (5) conspiring to commit money laundering, *id.* § 1956(h). The indictment also charged Big Man, but he died before trial.

After an eight-day trial, from August 27 to September 6, 2002, the jury returned a guilty verdict on most counts, including the RICO violations, several counts of dealing in stolen property and the money-laundering conspiracy charge. The Shalashes moved for a judgment of acquittal or a new trial. They argued that (1) they received an unfair trial due to references to their ethnicity during the trial (particularly in view of the proximity between the date of their trial and the one-year anniversary of September 11, 2001), (2) the Government's closing argument amounted to prosecutorial misconduct, and (3) the evidence did not support the verdict.

The district court denied the Shalashes' motion. The court observed that it "was particularly vigilant during the trial to guard against any inappropriate references that could tie the defendants to any anti-middle eastern sentiment." D. Ct. Op. at 3. The Arab references, moreover, were "proper for identification purposes," and "the evidence indicating that the defendants spoke in Arabic at times was relevant to show an intent to hide their business dealings." *Id.* The Government's closing argument did not require a new trial, the court concluded, because the reference to wealth related to "the wrongful nature of ill-gotten gains" and reminded the jury that they "had the opportunity and responsibility to take action," while the reference to other crimes "referred to the pattern of ongoing activity indicative of the RICO prosecution." *Id.* at 3—4. Lastly, the court concluded, the evidence supported the verdict. The district court sentenced Tareq Shalash to thirteen 78-

month prison terms and one 60–month prison term, all to be served concurrently. And Ziyad Shalash received eight 57–month prison terms, all to be served concurrently.

## II.

The Shalashes first challenge the admission of testimony related to their ethnicity and to the ethnicity of other individuals involved in the operation under Rule 403 of the Federal Rules of Evidence. Rule 403 permits a district court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." When a party makes a timely Rule 403 objection, we review the district court's ruling for an abuse of discretion. *United States v. Sanders,* 95 F.3d 449, 453 (6th Cir.1996). Otherwise, the more daunting plain-error standard applies. *See United States v. Camejo,* 333 F.3d 669, 672 (6th Cir.2003) ("Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice.") (quotation omitted).

When faced with a Rule 403 challenge to evidence relating to ethnicity and race, courts consider how the evidence was used and the context in which it was introduced. If the evidence is relevant to the case and the party does not use the evidence impermissibly (*e.g.,* by trying to show that the individual's ethnicity is somehow indicative of guilt or by trying to arouse xenophobic fears), the admission of the evidence generally will not run afoul of Rule 403. *Compare United States v. Jankowski,* 194 F.3d 878, 881—82 (8th Cir.1999) (evidence of foreign language use was probative of an attempt to conceal communications and "was not linked with any argument or evidence that [the defendant] was more likely to have committed the crime because of her national origin"); *United States v. Black,* 88 F.3d 678, 681 (8th Cir.1996) (no

error occurred in allowing a witness to identify the defendant as "the Jamaican" because the record supported that it was the defendant's nickname, and "none of the statements referring to [the defendant] as 'the Jamaican' were used in a prejudicial manner"); *United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986) (evidence that Pakistanis dressed similarly regardless of wealth did not "subliminally appeal[ ] to guilt by association and [ ] to prejudice against foreigners" when properly used to rebut defense contention that defendant's dress showed he was too poor to be a major drug dealer); *United States v. Scott,* No. 92–6435, 1993 WL 280323, at *5 (6th Cir. July 26, 1993) (no error in admitting photos suggesting interracial sexual activity when "[t]he interracial nature of this case was evident when witnesses testified, and the photos simply constituted more evidence of the relationships among the individuals involved"), *with United States v. Rodriguez Cortes,* 949 F.2d 532, 540—42 (1st Cir.1991) (reversing conviction where district court admitted defendant's Colombian identification card and the Government argued that because the defendant was a Colombian, he must have ties to Colombian drug dealers).

■ In this case, the 12 references to ethnicity challenged by the defendants do not rise to the level of reversible error. In one instance, the testimony helped to establish identification. Charlotte Harris knew the man who brokered stolen trailers for the Shalashes only as "Sam," then described him as an "Arab" man. JA 698. The Government later proved that "Sam" was Sam Shalali, an Arab man who had sold stolen trailers to Tareq. The district court did not abuse its discretion in rejecting the defendants' objection to this identification evidence.

■ In other instances, the testimony was not prompted by questions from the Government but came in through otherwise probative testimony. Charles Cox, who investigated Shalali, said at trial that he could not pronounce Shalali's name, then added that it was of "Arab descent." JA 801. Prosecutors asked Alfred Cornette, a manager for the Shalashes, if the people selling goods to the Shalashes "want[ed] cash." JA 403. Cornette responded that "[t]hey pretty much demanded it ... there [were] other Arabic people that would [otherwise] buy the product." *Id.* Prosecutors asked Officer Daris Sneed "what kinds of places" he was investigating, and Sneed responded: "I went to little Mini–Marts, Mini–Mart stores, mainly Arab[ ]-owned markets in different communities." JA 641. The prosecutors did not directly solicit any of this testimony, and the defense did not object to any of it on Rule 403 grounds. The admission of these innocuous references to ethnicity does not rise to the level of plain error.

■ In another instance, the Government permissibly introduced ethnicity evidence on impeachment grounds. When Kim Berryman, a Shalash employee, told prosecutors that she could not remember who delivered razors to the Shalashes, prosecutors asked: "Did you tell [the police] that persons of Arab[ ] Middle Eastern descent deliver the majority of the razorblades?" JA 351. She responded: "Yeah, I think I did." JA 352. The court did not abuse its discretion in permitting this question over the defendants' objection because it allowed the Government to impeach a witness with regard to her *own* statement and to challenge her claim that she did not recall these vendors.

■ In another instance, the court admitted testimony relating to the Shalashes' frequent conversations in Arabic. Cornette testified that the Shalashes frequently spoke Arabic in his presence, and he

often heard his name but never knew the subject of the conversation, which made him "uncomfortable." JA 388—89. In admitting this testimony over the defendants' objection, the district court did not abuse its discretion because the most natural understanding of Cornette's discomfort stems not from a general antipathy toward Arabic-speaking individuals but from the notable fact that he worked at the United Trading Company and could not understand what they were saying and in particular could not understand what they were saying about *him*.

■ Officer Paul Sherman, who delivered trailers to Tareq, also testified that the Shalashes spoke Arabic in his presence. An undercover police officer, Sherman testified that "when you're in there by yourself like that, ... you don't know what they're talking about, if they're talking about, ... doing something to you or what." JA 925. Like Cornette's testimony, Sherman's testimony does not naturally prompt xenophobic fears; it more naturally reveals a concern that the Shalashes were hiding something from him. Unlike Cornette's testimony, the Shalashes failed to object to Sherman's testimony; its admission was not plainly erroneous.

■ Other testimony seems to have had little probative value either because the testimony was vague or because the offending question was never answered. Prosecutors asked Timothy Clifton, a shoplifter who dealt with the Shalashes, if the man who taught him to steal was "an Arabic person," and Clifton responded "yes." JA 359. Prosecutors asked Cathy Taylor, a local bank employee, if the vendors coming to the bank to cash checks from the Shalashes had "any particular nationality," but she could not remember. JA 989. Defendants did not object to these isolated questions, and in neither instance did the question (or answer)

amount to an "egregious error [ ] that directly [led] to a miscarriage of justice." *Camejo*, 333 F.3d at 672.

Prosecutors asked Linda Khriss, who purchased goods from the Shalashes, if it was "known in the Arab community, especially those dealing in the stores in Cincinnati, that a place to sell milk was Big Man in Lexington?" JA 444. Defense counsel objected on hearsay grounds, not Rule 403 grounds, and the district court sustained the objection. The asking of the question by itself did not amount to plain error.

■ The Shalashes finally challenge two other statements. Prosecutors asked Cornette "what the people that were bringing the loose cans [of baby formula] in looked like generally." JA 385. Cornette responded "[T]hey were all Arabic people from different nations." *Id.* In overruling the Shalashes' objection, the district court said: "I think he's entitled to say what he saw, and I don't see that this [was] unduly prejudicial." JA 384. Along the same lines, prosecutors asked Linda Rader, another Shalash employee, for the "[r]ace and dress" of those selling goods to the Shalashes. JA 616. Rader said, "[i]t would be Arab[ ] men." *Id.* After the Government asked several more questions, defense counsel finally objected, and the court overruled, saying "I think that is relevant.... There's no racial animus here, it's just what she says happened." JA 624.

While it is difficult to see the Government's need for this testimony, its appearance in an eight-day trial does not prompt a "definite and firm conviction that the trial court committed a clear error of judgment" by admitting this testimony. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999). As the district court observed, the witnesses related only their

personal observations, and the prosecutor did not pursue these matters further.

In concluding that these 12 pieces of testimony did not rise to the level of plain error in some instances or to an abuse of discretion in other instances, two other points deserve comment. First, this criminal case involved three defendants (at least initially), all with Arab names, all from the same Arab family, all of Arab descent and all Arabic speaking, and many witnesses of Arab descent and with Arab names. Some of the most incriminating evidence obtained by the Government involved tape-recorded conversations of the defendants and others speaking in Arabic, which required English translations for the jury. Even the most mildly-attentive juror could not have sat through this eight-day trial without realizing that it involved defendants and many witnesses of Arab descent. Whether before 9/11, after 9/11 or near the one-year anniversary of 9/11, the names, language and appearance of the defendants could not have been obscured from the jury.

Second, the defendants themselves introduced similar evidence. Defense counsel asked Linda Khriss, an Arab woman who cooperated with the Government, if Big Man "was the head of the family and in charge of the business." JA 471. The witness said "being Arab, always the father is in charge of everything," to which the Shalashes' attorney replied: "Thank you. That's a very good point. Thank you." *Id.* During summation, the defense quoted this testimony and argued that Ziyad acted only at the direction of his father. The defense also challenged Khriss about her choice of Arabic words when she told several Shalash associates that she received her goods from a "harami" or thief. Invoking this testimony, the Shalashes argued that "harami" was an uncommon Arabic word for thief and that the

Shalash associates may have misunderstood her when she explained that her goods were stolen.

As the common-sense realities of this case suggest and as the evidence introduced through defendants' own counsel confirms, no one could have tried this case without introducing some evidence concerning the ethnic origin of the defendants and many witnesses, and no jury could have heard this case without appreciating the ethnic origin of many individuals in the case. The question under these circumstances is not whether ethnicity was mentioned; it is whether the Government tried to connect ethnicity with criminal propensities. In our view, it did not. Like the district court, we believe that the challenged testimony was probative in some instances, unprompted by the Government in other instances, and insufficiently prejudicial in still other instances. Whether the challenged testimony is viewed individually or for its cumulative effect, these references to ethnicity it did not create an "undue tendency to suggest a decision based on improper considerations." *United States v. Bilderbeck,* 163 F.3d 971, 978 (6th Cir.1999).

Acknowledging that it would have been impossible to conceal the ethnicity of the defendants and many witnesses entirely, the defendants persist that the Government had a duty to be particularly vigilant in this case (in view of the one-year anniversary of 9/11) and that the Government's conduct crossed the line between permissible and impermissible references to race established by several cited cases. While we agree with the defendants that the Government—and the district court as well—needed to be exceedingly mindful and watchful of these concerns, the references to ethnicity in this trial did not cross any prohibitory line. The cases cited by the Shalashes share a common element

missing here: Namely, they involved a Government lawyer questioning a law enforcement official, sometimes as an expert, about the criminal practices of an ethnic community for the purpose of establishing a *modus operandi* based on race. *See United States v. Doe,* 903 F.2d 16, 19—23 (D.C.Cir.1990); *see also United States v. Cabrera,* 222 F.3d 590, 594—97 (9th Cir. 2000); *United States v. Vue,* 13 F.3d 1206, 1211—13 (8th Cir.1994); *United States v. Cruz,* 981 F.2d 659, 662—64 (2d Cir.1992). While the Government in this case occasionally asked witnesses to identify the race of an individual, it did not call a witness for the purpose of establishing a *modus operandi* common to Arab-fencing operations or some other criminal propensity.

Nor, more specifically, does *United States v. Rodriguez Cortes,* 949 F.2d 532 (1st Cir.1991), advance the Shalashes' argument. There, the Government introduced an identification card to show that "it was more likely than not that the defendant, as a Colombian, would know about the conspiracy and be entrusted [by his fellow Colombians] as a courier." *Id.* at 541. In closing, the Government argued that the defendant was a conspirator because he was a Colombian. *Id.* ("[T]his young man has ties with Colombia, from there you can reasonably infer why [a Colombian dealer] was calling him his friend."). In this instance, the Government simply did not make a comparable argument to the jury, which places this case on the permissible side of the ethnic-references line. *See United States v. James,* 30 F.3d 84, 85 (8th Cir.1994) (references to nationality did not imply "a connection ... [to] the likelihood of involvement in the drug trade[, which] distinguishes this case from others where references to ethnic origin were tied to implications of likelihood of involvement in criminal activity because of that ethnic ori-

gin"); *see also United States v. Blackwood,* 913 F.2d 139, 143 (4th Cir.1990) (defendant's Jamaican passport did not "excite xenophobic hostility" when the Government introduced the passport "for the purpose asserted," namely that the defendant exercised control over the room where the passport was found).

### III.

The Shalashes next challenge the fairness of their trial based on their objections to the Government's closing argument—not because the argument referred to the ethnicity of the defendants but because it was otherwise improper. Although we agree with the Shalashes that the Government should have known better with respect to some portions of its closing argument, the misconduct was sufficiently isolated that it does not require a new trial.

In reviewing allegations of prosecutorial misconduct, we initially ask whether the prosecutor's comments were improper. *See United States v. Galloway,* 316 F.3d 624, 632 (6th Cir.2003). If so, we ask whether the comments were flagrant and warrant reversal by considering: "(1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise strong." *Id.* Even if the comments were not flagrant, a new trial is called for if: "(1) the other evidence is not overwhelming; (2) [the defendant] objected at trial; and (3) there was no curative admonishment by the judge." *Id.* at 633.

■ Several of the challenged statements were not improper and thus do not clear the first hurdle for obtaining a new

trial. The references to the Shalashes "getting rich" and having "extra money" permissibly highlighted their illegally-obtained wealth and their abuse of corporate power in running a racketeer-influenced company. *Cf. United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("[I]t is not improper in a Sherman Act case to discuss corporate power, its use and abuse, so long as those statements are relevant to the issues at hand. For that subject is material to the philosophy of that Act."); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir.1955) ("Where the nature of the offense charged reasonably includes a consideration of the economic status of the injured persons ... a defendant has no just cause to complain if their status is disclosed and commented upon in presenting the case to the jury."). Far from arguing that the Shalashes should be convicted because they were wealthy, *see Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir.1990) (prosecutor improperly "suggested to the jury that the defendant could afford to buy justice in court through the use of expensive exhibits and multiple defense attorneys"), the prosecution argued that they had become wealthy because of their criminal activity.

■ The Government also permissibly reminded the jury of their role in the judicial system, that the decision to convict lay in their hands. "We can investigate," the prosecutor argued, "we can prosecute ... till the cows come home, but if you don't do it, it doesn't get done. I repeat, it's time for them to go." Similar arguments, we have held, do not require a new trial. *See United States v. Alloway*, 397 F.2d 105, 113 (6th Cir.1968) ("You the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Allo-

ways know that this type of conduct will not be tolerated, that we're not going to tolerate [it]."); *Henderson*, 218 F.2d at 19 ("Unless calculated to inflame the minds of the jurors, an appeal to the civic responsibilities of jurors as law-abiding citizens is not misconduct."). Unlike the cases cited by the Shalashes, where the prosecutors improperly suggested "that unless this defendant is convicted it will be impossible to maintain 'law and order' in the jurors' community," *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir.1977); *see United States v. Solivan*, 937 F.2d 1146, 1154 (6th Cir.1991), the prosecutor here emphasized only that the Government could not convict the Shalashes without a guilty verdict.

■ The same cannot be said of two other arguments made by the prosecutor. In one of them, the prosecutor argued:

[Y]ou know, because of the pattern and the continuity established here, that it was going on long before that, and you know instinctively that we didn't catch everything they did. This, ladies and gentlemen, is the tip of the iceberg. This is one little window into that Shalash enterprise. This is only what we could prove. Law enforcement knew this was going on, and they proved it was going on, and it's time for them to go.

JA 1111. During rebuttal, the Government continued, "[W]hat I'm trying to tell you is that we just have here a small cross-section of what they really did. This is what we caught them doing; not what they did." JA 1128. "[T]ip of the iceberg" arguments, we have held, impermissibly encourage convictions based on crimes that the Government made no attempt to prove, much less ever charged. *See Snipes v. United States*, 230 F.2d 165, 166 (6th Cir.1956) (prosecutor's argument that "[w]e could have made thirty or forty counts in this thing" was improper and

prejudicial because "[t]here was no basis in the evidence for this assertion").

■ In the other argument, the prosecutor said:

[F]or the last couple of years, ... the Ohio Task Force and the Memphis Task Force and the Lexington FBI put[ ] this altogether [sic], interviewing the witnesses, spending countless hours and hundreds of thousands of dollars investigating this. And ... the United States Attorney's Office put[ ] together this case, long hours, long investigations, research, and money.

JA 1125—26. The considerable resources spent on a trial (and investigation) no more prove the guilt of the defendant than they do the potential inefficiency or incompetence of the Government. The argument has no place in a criminal trial. *See United States v. Bess,* 593 F.2d 749, 754 (6th Cir.1979) ("[I]t is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted."); *see also United States v. LaMorte,* 950 F.2d 80, 83 (2d Cir.1991) ("The prosecutor's statement that '[y]ou don't think the government is busy enough prosecuting crimes that it has the time to be prosecuting innocent people, going after people arbitrarily?' was improper.").

■ Improper though these two statements were, they do not require a new trial when gauged by the factors outlined in *Galloway,* 316 F.3d at 632. The first factor (the tendency to mislead the jury and prejudice the accused) does not support a new trial. A reading of the transcript shows that the evidence properly admitted at trial dominated the Government's closing argument. The prosecutor's reference to the resources spent on the prosecution, though inappropriate, merely reinforced what was self-evident from the record: The Government devoted considerable resources, including law enforcement officials from three States, to investigating the Shalashes. And the Government did not make its "tip of the iceberg" comment in isolation but as a way of emphasizing the ongoing nature of the corrupt enterprise and its pattern of criminal behavior. Any remaining risk of prejudice to the defendants from these remarks was diminished by the district court's instruction that the jury should consider only evidence presented against the Shalashes, not unproven crimes or facts outside of the record.

The second factor (whether the statements were isolated or pervasive) and the third factor (whether the statements were deliberately placed before the jury) do not support a new trial. The two remarks were isolated, and there is no indication that they stemmed from a deliberate plan to inflame the jury as opposed to unduly-zealous advocacy.

The fourth factor (the strength of the evidence) also shows that the defendants did not receive an unfair trial. The Government produced extensive evidence in support of the 22 convictions, many of which the defendants do not challenge on sufficiency grounds. All four factors considered, the prosecutor's remarks were not flagrant under the *Galloway* test.

Even when the prosecution's conduct is not flagrant under the four *Galloway* factors, we still may insist on a new trial if the evidence in favor of conviction is close. *See Galloway,* 316 F.3d at 633. That is not the case here, however. Considerable evidence favored the convictions, and the district court's curative instruction made sure that any risk of prejudice from the closing argument was minimal.

## IV.

■ The defendants next argue that the district court erred in giving a deliber-

ate-ignorance instruction to the jury. After describing the elements of the various crimes charged in the indictment, the district court explained:

No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that a particular defendant deliberately ignored a high probability that the property he was purchasing was stolen, then you may find that he knew that it was stolen. But to find this, you must be convinced beyond a reasonable doubt that the particular defendant was aware of a high probability that the property was stolen, and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict. This, of course, is all for you to decide.

JA 1188—89. Applying an abuse-of-discretion standard, we review the district court's choice of jury instructions "to determine whether they fairly and adequately inform the jury of relevant considerations and explain the applicable law to assist the jury in reaching its decision." *United States v. Prince*, 214 F.3d 740, 760 (6th Cir.2000).

The district court did not commit reversible error in giving this instruction. All of the stolen-property crimes required the Government to show that the Shalashes knew that the relevant goods were stolen. *See* 18 U.S.C. § 659 ("knowing the [goods] to have been embezzled or stolen"); *id.* § 2314 ("knowing the [goods] to have been stolen"); *id.* at § 2315 (same). And the instruction follows the Pattern Criminal Jury Instructions for the Sixth Circuit § 2.09 (1991), which accurately states Sixth Circuit law with respect to this issue. *United States v. Mari*, 47 F.3d 782, 785 (6th Cir.1995).

Nor did the Government's use of a deliberate-ignorance instruction in connection with 18 U.S.C. § 21 alter this conclusion. That section provides:

(a) Wherever in this title it is an element of an offense that—

(1) any property was embezzled, robbed, stolen, converted, taken, altered, counterfeited, falsely made, forged, or obliterated; and

(2) the defendant knew that the property was of such character;

such element may be established by proof that the defendant, after or as a result of an official representation as to the nature of the property, believed the property to be embezzled, robbed, stolen, converted, taken, altered, counterfeited, falsely made, forged, or obliterated.

(b) For purposes of this section, the term "official representation" means any representation made by a Federal law enforcement officer ... or by another person at the direction or with the approval of such an officer.

This statute allows law enforcement officials to conduct sting operations by representing goods as stolen and proving the defendants believed the representation.

The Shalashes argue that deliberate ignorance applies just to "knowledge" offenses, not to "belief" under 18 U.S.C. § 21. Analogizing "belief" to the "intent" required for a conspiracy conviction, the Shalashes invoke *United States v. Mankani*, 738 F.2d 538 (2d Cir.1984), which says that deliberate ignorance may never support a finding of "intent." *Id.* at 547 n. 1 ("If someone can consciously avoid learning of the activities and objects of a conspiracy, how can that person ever intend those events to take place?"). For similar reasons, the defendants urge, they could not form a "belief" concerning the stolen

nature of goods if they were deliberately ignorant of the goods' origin.

The instructions given by the court do not support this argument. Nothing in the deliberate-ignorance instruction mentioned 18 U.S.C. § 21 or hinted that the jury could find a "belief" that goods were stolen based on evidence of deliberate ignorance. Because we must assume that the jury followed the instructions as written, *see Mari*, 47 F.3d at 785—86, the argument is unavailing.

 Ziyad Shalash separately argues that the evidence did not support a deliberate-ignorance instruction. *Mari*, however, forecloses this argument. In that case, we recognized that deliberate ignorance "applies when there is sufficient evidence to support a finding of deliberate ignorance beyond a reasonable doubt," then observed that if evidence did not support a verdict under a deliberate indifference theory, the jury would ignore the instruction. 47 F.3d at 785. If the Shalashes are correct that the evidence does not support a deliberate ignorance theory, "the error was harmless [ ] for the only way we can conclude that the deliberate ignorance instruction was harmful is if we assume that the jury applied the instruction contrary to its express terms." *Id.* at 786 (quotation omitted); *see also Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (While jurors' "own intelligence and expertise" may not save them from making legal errors, "[q]uite the opposite is true [ ] when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.") (emphasis omitted).

## V.

The Shalashes also challenge the sufficiency of the evidence on a number of counts. They carry a heavy burden in doing so because we will affirm the convictions if "after viewing the evidence in the light most favorable to the prosecution . . . any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir.2003) (quotation omitted).

## A.

 The Shalashes first challenge their RICO convictions. Count 1 charged the brothers with conspiring to violate RICO, 18 U.S.C. § 1962(d), and Count 2 charged them with conducting an enterprise "through a pattern of racketeering activity," 18 U.S.C. § 1962(c). Contrary to the Shalashes' arguments, the evidence supports the conclusion that Unity Wholesale Grocers and United Trading Company were RICO "enterprises" and that the Shalashes engaged in a "pattern of racketeering activity."

Proof of a RICO "enterprise" requires the Government to show: "(1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *United States v. Chance*, 306 F.3d 356, 372 (6th Cir.2002). Alfred Cornette, the former president of United Trading, explained the organization's decision-making structure and the defendants' duties. He testified that Big Man owned Unity Wholesale Grocers, Tareq (the oldest son) was second in charge, and Ziyad assumed control of United Trading after Cornette quit. The enterprise was also "separate and distinct" from the racketeering activity, because "[o]ut of tens of millions of dollars in sales . . . [and]

accepting the jury's verdict at face value[,] the companies sold [only] several hundred thousand dollars in stolen merchandise." Ziyad Shalash Br. at 15. These legitimate sales support the conclusion that Unity Wholesale Grocers and United Trading Company maintained an existence "separate and distinct" from the fencing operation.

The Government also established a "pattern of racketeering activity," which requires "not only that at least two predicate acts occurred, but also a 'relationship between the predicates' and the 'threat of continuing activity[.]'" *United States v. Blandford*, 33 F.3d 685, 703 (6th Cir.1994). The jury in this instance returned convictions on 13 of the charged predicate acts relating to the same fencing operation, all of which (as we explain below) the evidence supported.

### B.

Tareq Shalash disputes the sufficiency of the evidence to support the convictions on Counts 4—6, which stem from Tareq's receipt of stolen infant formula. The substantive offense, 18 U.S.C. § 2314, requires proof of the following elements: "(1) transporting, or causing the transportation, (2) in interstate commerce, (3) of property valued at $5,000 or more, (4) with knowledge that it has been stolen, converted, or fraudulently taken from its rightful owner." *United States v. Monus*, 128 F.3d 376, 384 (6th Cir.1997). The Government relied on 18 U.S.C. § 21 to satisfy the knowledge requirement by showing that law enforcement officials represented the goods as stolen and Tareq believed them.

The Government introduced considerable evidence showing the Shalashes established a "pipeline" of stolen infant formula moving from Cincinnati and Columbus, Ohio to Kentucky. Linda Khriss testified that she called Big Man and Ziyad to arrange a sale of infant formula; she told them that she acquired the infant formula from a thief; they nonetheless accepted the formula; and Tareq paid her in cash.

The Government also called several other participants in the "pipeline," who delivered the formula to Tareq. The Government's testimony showed that Mohammed Omran in Cincinnati ran a "side business" of collecting stolen goods and selling them to the Shalashes. Infant formula that police officers sold (and represented as stolen) to Adnan Jallaq in Count 4 ended up in Omran's hands, and police officers followed it to Tareq's warehouse, where he personally accepted the delivery at night. In Count 6, the police sold more formula to Jallaq, who again sold it to Omran. Omran then made a second delivery to Tareq's warehouse, this time in a small Ford Ranger pick-up truck with a cover over the truck bed.

Officers in Columbus, Ohio represented the infant formula in Count 5 as stolen and sold it to Mustafa Shalash. Mustafa then sold it to Fayez Shalash—who was Big Man's agent in Columbus and who pleaded guilty to a stolen-goods conspiracy. Fayez later delivered the infant formula on November 1, 2000 at 8 p.m. to Tareq's warehouse.

In determining whether sufficient evidence shows that Tareq believed the goods he purchased from the Shalash associates in Ohio were stolen (Counts 4—6), the Government may rely on circumstantial proof to establish Tareq's state of mind. *See United States v. Scruggs*, 549 F.2d 1097, 1104 (6th Cir.1977) ("It has long been recognized in this circuit and elsewhere that circumstantial evidence ... [construed] in light of common experience can be sufficient to support a jury's determination that a defendant had guilty knowledge beyond a reasonable doubt."); *United*

*States v. Werner,* 160 F.2d 438, 441—42 (2d Cir.1947) (L.Hand, J.) ("The receivers of stolen goods almost never 'know' that they have been stolen, in the sense that they could testify to it in a court room. The business could not be so conducted, for those who sell the goods—the 'fences'—must keep up a more respectable front.... But that the jury must find that the receiver did more than infer the theft from the circumstances has never been demanded.").

The circumstantial evidence here shows that Tareq played a leading role in managing the Shalash operation, which repeatedly received stolen infant formula from Ohio. He was second in charge; he paid for the deliveries of the formula from Ohio; he received two of the deliveries at night and received the other delivery from a pick-up truck; and he worked closely with his father Big Man and brother Ziyad, who each plainly knew the goods received from Ohio were represented as stolen. *See United States v. Warshawsky,* 20 F.3d 204, 209 n. 2 (6th Cir.1994) ("In assessing [the defendants'] knowledge that the parts were stolen, the jury could properly consider the fact that the defendants were both brothers and business partners, which raises a permissible inference that they might share information concerning their business activities."). Given the amount of stolen goods the Shalashes were selling and Tareq's knowledge of these other transactions, he can hardly claim to be an innocent about the general nature of their business or the specific source of the infant formula. *See* JA 1418 (undercover officer Paul Sherman, who sold goods represented as stolen, asked Tareq if he was a police officer, and Tareq responded: "If I were police, you would have been gone a long time ago or I woulda' been gone [a] long time ago."). Keeping in mind that "we must consider the evidence as a whole, and not as individual pieces, and remem-

ber[ing] that the jury is entitled to base its decision on reasonable inferences from circumstantial evidence," *United States v. Rahman,* 189 F.3d 88, 122—23 (2d Cir. 1999) (citation omitted), a rational juror could conclude that Tareq believed the goods he received in Counts 4—6 were stolen. *See United States v. Langley,* 466 F.2d 27, 32 (6th Cir.1972) ("That other inferences might have been drawn [from the evidence] does not mandate reversal.").

### C.

██ Tareq next disputes the sufficiency of the evidence for Counts 14 and 15, which stem from two trailers stolen by Charlotte Harris and brokered by Sam Shalali, a Shalash business acquaintance. The substantive offense for these counts, 18 U.S.C. § 659, punishes "[w]hoever [ ] steals ... from any ... motortruck, or other vehicle, or from ... any storage facility ... any goods or chattels moving as or which are a part of or which constitute an interstate ... shipment of freight ...; or [w]hoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen."

Ample evidence shows that Tareq knew the trailers and goods were stolen. Tareq dealt directly with Sam Shalali, who knew the goods were stolen and who received payment from Tareq for the goods. Charlotte Harris delivered the first load (Count 14) to what appeared to be a vacant warehouse with no employees in it. When Harris asked for assistance in disposing with the empty stolen trailer, Shalali said she could not leave it at the Shalashes' warehouse. Tareq also paid a suspiciously low price for the goods in Count 14. Cornette earlier warned Tareq about the low price he was paying for some of his goods, and Cornette further recognized that "[t]he

other products that were [in the Shalash warehouses] were very close margins. Probably 10 percent or less." JA 402. In the light of this testimony, a jury could infer that Tareq knew the goods in Count 14 were stolen when he paid only 75% of their market value. *See United States v. Cook*, 432 F.2d 915, 916 (6th Cir.1970) (evidence proving that the defendant "bought [the goods] for a price so low as to warrant grave doubt about the transaction" supported stolen-goods conviction); *see also United States v. Smith*, 502 F.2d 1250, 1254 (5th Cir.1974) (evidence that defendant "was directly involved in selling engines [for 67% of] their retail value" supported stolen-goods conviction); *Melson v. United States*, 207 F.2d 558 (4th Cir.1953) (selling eggs by the dozen at 61—80% of their value supported inference that defendant knew eggs were stolen). And when Shalali delivered another stolen load (Count 15) with Charlotte Harris on New Years' Eve, and Tareq paid only 61% of the market value for the goods, a permissible inference arose that Tareq knew these goods and this trailer also were stolen.

### D.

■ Tareq next challenges his convictions on Counts 19 and 20, which also involve violations of 18 U.S.C. § 659, and which stem from Tareq's possession of two stolen trailers filled with consumer goods. Tareq again argues that the Government did not produce sufficient evidence that he knew the goods were stolen. The police, however, found a non-negotiable bill of lading in Tareq's office for the load covered by Count 20. The document required "Schneider Dedicated" to transport the trailer from the Kimberly Clark Corporation in South Carolina to a Sam's Distribution Center in Arkansas. Because Tareq possessed a bill of lading showing that the trailer belonged to someone else, a jury could fairly infer that he knew the goods were stolen. *See United States v. Thuna*, 786 F.2d 437, 438 (1st Cir.1986) ("If [the defendant] did have the bill of lading, he certainly would have known that the [goods] were stolen, since that document listed the intended recipient of the shipment."); *see also United States v. Jewell*, 893 F.2d 193, 194 (8th Cir.1990) (evidence supported conviction under 18 U.S.C. § 659 because defendant "was present when the bills of lading were examined"). While the police found no similar document for the load covered by Count 19, "an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods." *Barnes v. United States*, 412 U.S. 837, 843, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *see United States v. Johnson*, 741 F.2d 854, 857—58 (6th Cir. 1984); *Pearson v. United States*, 192 F.2d 681, 689 (6th Cir.1951) ("[P]ossession must be accounted for in a straightforward, truthful way, and unless the jury finds the explanation reasonable and satisfactory, they may be warranted in returning a verdict of guilty."). *That inference is particularly appropriate when a person is found to be in possession of stolen property on repeated occasions, which is assuredly the case here. See* Model Penal Code, §§ 223.6(2)(a) & (b) ("knowledge or belief is presumed in the case of a dealer [in the business of buying and selling goods] who . . . is found in possession or control of property stolen from two or more persons on separate occasions; or [ ] has received stolen property in another transaction within the year preceding the transaction charged").

### E.

■ Tareq next challenges his convictions on Counts 17, 18 and 22, involving further violations of 18 U.S.C. § 2314, which prohibits the interstate transporta-

tion of stolen goods valued at $5,000 or more with knowledge that the goods were stolen. Paul Sherman, a Memphis police officer, posed as truck driver Steve Worley and delivered the following loads from Tennessee to Tareq in Kentucky: (1) cereal and hair care products on April 12, 2001 (Count 17); (2) skin care and various other products on April 25, 2001 (Count 18); and (3) Motrin on May 15, 2001 (Count 22). Because these counts involved an undercover sting operation, the Government relied on 18 U.S.C. § 21 to show belief that the goods were stolen.

Sherman represented his goods as stolen to Tareq, and Tareq's actions show that he believed the goods were stolen. On April 11, 2001, the day before Sherman delivered the goods charged in Count 17, he told Tareq in a recorded phone conversation that he "grabbed it over in ... West Memphis, and [ ] I've got to get it up there." JA 1333. He also told Tareq "I don't have no bills [of lading] for it or nothin'." JA 1334. When Sherman actually delivered the load, he told Tareq: "oh, man, we got a Kroger place up there you can steal this shit all day long, I'll get it and gone." JA 1343. Tareq expressly told Sherman: "Don't tell me you[r] business." JA 1345. When Sherman said "[t]here's a big parkin' lot over there. You can get anything you want," Tareq replied, "I don't want to hear about it." JA 1349. On the final delivery (May 15, 2001), Tareq asked Sherman to sign a document warranting that Sherman did not steal the goods in that shipment "for my protection [ ][i]n case they come down on you." JA 1418. Sherman then asked Tareq if he was a police officer, and Tareq responded: "If I were police, you would have been gone a long time ago or I woulda' been gone [a] long time ago." *Id.* "[Y]ou scared me [the] other day," Tareq added. JA 1420. "You tell me, this is my stuff, this is, you know, don't cost me nothing. You

shouldn't be telling me shit like that." These conversations permissibly allowed the jury to find that Sherman represented the goods as stolen prior to delivery and Tareq believed him.

Tareq counters that 18 U.S.C. § 21 requires that an "official representation" must be a "presentation of fact," and Sherman never made a "presentation of fact" that the goods were stolen. Tareq Shalash Br. at 48. Tareq is correct, however, only in the sense that Sherman did not say the word "stolen" every time he delivered goods. Sherman made numerous representations of fact, beginning with a taped phone conversation the day before his first delivery (Count 17), relating to how he obtained the goods. In using phrases like "grabbed it," JA 1333, "I can't keep it around long," JA 1334, "I gotta get outta here," JA 1335, "I don't have no bills [of lading] for it or nothin'," JA 1334, "you can steal this shit all day long, I'll get it and gone," JA 1343, "you just snatch it [and] go," JA 1399, and "you can't tell nobody where you get it from," JA 1345, Sherman gave a jury ample reason to conclude that he represented his goods as stolen. Indeed, at the end of a recorded conversation with Tareq on May 15, 2001, Sherman talked about being questioned by authorities if he had a Wal–Mart trailer attached to a non-Wal-Mart tractor, after which Tareq responded "[b]ut you better look at it so it won't be no clothes or other bullshit." JA 1450. The suggested transportation of goods in a Wal–Mart trailer by Sherman, who was not a Wal–Mart employee, is itself indicative that Sherman was selling stolen goods, and Tareq's comment that Sherman needed to look in the trailer to make sure he had consumer goods, not stolen clothes, confirms that Tareq believed he was dealing with a thief.

■ Tareq also challenges the value of the goods charged in Count 18. *See* 18

U.S.C. § 2314 (requiring the stolen goods to have a "value of $5,000 or more"). This load contained hand lotion, ointment, cough drops, nasal breathing strips, infant formula and mouth wash. The indictment indicates the correct date of the shipment (April 25, 2001), but mentions only "skin care products" valued at $5,000 or more. Tareq does not dispute the overall value of the load—$37,660—which is more than sufficient to meet the statutory amount. To the extent Tareq argues that a variance occurred between the proof at trial and the allegations in the indictment—an argument that is anything but clear from his brief—reversal is warranted only when the variance affects the defendant's substantial rights, *see United States v. Manning*, 142 F.3d 336, 339 (6th Cir.1998), which did not happen here.

### F.

▮ Tareq next contests the conspiracy charge against him (Count 21) related to the May 15, 2001 delivery of Motrin. In order to establish a conspiracy, the Government must prove: "(1) that the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the defendant willfully became a member of the conspiracy; (3) that one of the conspirators knowingly committed an overt act; and (4) that the overt act was knowingly done in furtherance of the conspiracy." *United States v. McGahee*, 257 F.3d 520, 530 (6th Cir.2001). During the April 12, 2001 delivery of stolen goods, Sherman indicated that he could steal a trailer of Motrin and asked Tareq if he was interested, to which Tareq responded "[t]hat's my number one item," and agreed to purchase it from Sherman. JA 1345. Sherman then said: "You can't tell nobody where you get it from," to which Tareq responded: "That's right. I don't want to know." *Id.* On May 15, 2001, Sherman delivered the Motrin.

Tareq argues that the Government did not allege or prove that he agreed with anyone other than an undercover police officer. *See United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir.1989) ("It is settled that proof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction.") (quotation omitted). The indictment, however, alleges that Tareq "conspired and agreed with other persons *known and unknown* to the Grand Jury." JA 104 (emphasis added). The Government need not specifically identify the other conspirators, *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir.1991), and the evidence supports a finding that Tareq operated the family business with Big Man, Ziyad and others by routinely purchasing stolen goods from truck drivers and shoplifters, *see United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985) ("A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan."). Ziyad was often present and helped unload Sherman's goods. The youngest Shalash brother, Anas, was also present for some of Sherman's deliveries and helped Tareq negotiate the price for some of Sherman's goods. Although the record does not reveal a specific discussion between Tareq and others concerning the Motrin delivery, "[t]he government need not prove ... that each [conspirator] knew the full extent of the conspiracy, because such facts may be inferred from the interdependence of the enterprise." *United States v. Rogers*, 118 F.3d 466, 478 (6th Cir.1997); *see also United States v. Lloyd*, 10 F.3d 1197, 1211 (6th Cir.1993) ("[T]he circumstantial and direct evidence of the ongoing involvement between [the defendants], and of their illicit activities, was sufficient to allow a reasonable jury to conclude that a mutual un-

derstanding existed between them that they would together violate the drug laws with which they were charged."). Construing the evidence most favorably to the Government, a rational juror could conclude that Tareq agreed with other persons to cause the interstate transport of the Motrin.

### G.

■ Ziyad contests his individual conviction for violating 18 U.S.C. § 2315 (Count 23), which punishes "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods . . . of the value of $5,000 or more, which have crossed a State or United States boundary after being stolen . . . knowing the same to have been stolen." Ziyad claims that the Government failed to satisfy the "$5,000 or more" requirement.

The record is otherwise. Misty Washabaugh testified that she supervised an interstate shoplifting ring. She employed a number of shoplifters, transported the shoplifters to other States, collected their shoplifted goods and shipped the goods back to Kentucky. She sold "several thousand" dollars of goods to Ziyad, including razor blades. The evidence also shows that the Shalashes generally paid one-half of the wholesale price for the razor blades. If Washabaugh's "several thousand" dollars amounted to something less than $5,000, the evidence indicating that the Shalashes paid approximately one-half of the wholesale price doubles the "several thousand" dollar total. *See United States v. Perry*, 638 F.2d 862, 867—68 (5th Cir. 1981) (For purposes of 18 U.S.C. § 2314, "the market value of [stolen] goods . . . should be valued at the actual market value . . . *at which that victim offered the goods for sale.*") (emphasis added); *cf. Warshawsky*, 20 F.3d at 213 (approving *Perry* for purposes of calculating the value

of stolen property under U.S.S.G. § 2B1.1). On this record, adequate evidence supported the jury's verdict.

### H.

■ The Shalash brothers next contest their conviction under 18 U.S.C. § 1956(h) (Count 26), which prohibits individuals from conspiring to commit money-laundering in violation of 18 U.S.C. § 1956 or § 1957. Most relevant for our purposes, a violation of 18 U.S.C. § 1956(a)(1)(B)(i) requires proof of: "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct[ing] or attempt[ing] to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds." *Prince*, 214 F.3d at 747.

The evidence sufficed to convict the Shalashes under this count. A jury could infer that the Shalashes willfully formed the conspiracy based on the day-to-day conduct of their business. *See United States v. Searan*, 259 F.3d 434, 442 (6th Cir.2001) ("The agreement, intent to join it, and participation can all be inferred from acts done with a common purpose."). The Shalashes wrote checks to their sellers for stolen goods, then promptly cashed the checks with money they kept at their warehouses. When one witness questioned this practice, Tareq explained "that it was important as a business to show money going through your bank account." JA 559. In reference to the checks he wrote for sellers, Tareq told another witness, "I got to prove I'm buying and selling. People who [ ] make it up there [are] the people who work this way." JA 1444. Within days of his first indictment, Ziyad wrote a $715,000 check on United Trading Company's account to the younger Shalash brother, Anas. Anas converted this check

to a cashier's check which, at the time of trial, he had yet to cash. The Shalashes also transferred several hundred thousand dollars from their business accounts to Tareq's individual Paine Webber investment accounts. Together, these facts support a finding that the brothers sought to conceal the nature of their wealth and conspired to violate the money-laundering statutes. *See United States v. Crossley*, 224 F.3d 847, 856 (6th Cir.2000) ("Circumstantial evidence which a reasonable person could interpret as showing participation in a common plan may be used to establish the existence of a conspiracy agreement.").

The Government also proved that when Ziyad wrote the $715,000 check from United Trading Company's account to Anas shortly after his indictment, he knowingly committed an overt act in furtherance of the conspiracy. A rational jury could find that the check written to Anas involved proceeds of unlawful activity based on the evidence indicating that the Shalashes routinely funded their accounts through stolen goods transactions. Ziyad actively participated in the Shalashes' fencing operations and supervised United Trading Company, which supports the conclusion that he knew the funds in United Trading Company's accounts involved proceeds of illegal activity. Finally, diverting money from the family business accounts (which the Government ultimately froze) to an unindicted relative allowed the jury also to find that Ziyad knowingly wrote the check to conceal the "nature, location, source, ownership or control of the proceeds." *Prince*, 214 F.3d at 747; *see United States v. McGauley*, 279 F.3d 62, 70 (1st Cir.2002) (when the defendant "transferred $243,087.42 out of her existing bank accounts into new ones" after the search of her home, "a reasonable jury could have found ... that [her] purpose was 'to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [her crime]' ").

■ The Shalashes argue that the Government did not prove "that the money involved in the listed transactions represented the proceeds of the stolen property offenses," Ziyad Shalash Br. at 14, because the money received from selling stolen property represented only a small portion of the legitimate profits the Shalashes made. The Shalashes essentially argue that the Government must trace *all* of the money used in the money-laundering acts to the sale of stolen goods. Commingling funds derived from illegal activity with funds derived from legitimate transactions, however, satisfies the requirement under 18 U.S.C. § 1956(a)(1) that the transaction using the commingled funds involves proceeds from unlawful activity. *See United States v. Bencs*, 28 F.3d 555, 562 (6th Cir.1994) ("We do not read Congress's use of the word 'involve' as imposing the requirement that the government trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction.") (quotation omitted).

Nor does *United States v. McDougald*, 990 F.2d 259 (6th Cir.1993), alter this conclusion. There, we reversed a money-laundering conviction not because the Government failed to trace all of the laundered money to unlawful activity, but because the Government produced no evidence that *any* of the money came from unlawful activity. *Id.* at 261—62. The evidence here shows that criminal activity was part and parcel of the Shalash business and fully supports the conclusion that at least some of the money used in the overt acts originated from unlawful activity.

## VI.

For the foregoing reasons, we affirm.